# In the United States Court of Federal Claims

No. 12-576T

(E-Filed:  May 31, 2015)

|  |  |
|---|---|
| DYNETICS, INC. and SUBSIDIARIES, | ) Cross-Motions for Partial |
| | ) Summary Judgment; RCFC 56(a); |
| Plaintiff, | ) I.R.C. § 41; Treasury Regulation |
| | ) §1.41-4A; Funded Research |
| v. | ) Exception |
| | ) |
| THE UNITED STATES, | ) |
| | ) |
| Defendant. | ) |
| | ) |

<u>David M. Wooldridge</u>, Birmingham, Ala., for plaintiff.

<u>Jason Bergmann</u>, Trial Counsel, with whom were <u>Caroline D. Ciraolo</u>, Principal Deputy Assistant Attorney General; <u>David I. Pincus</u>, Chief, Court of Federal Claims Section, <u>Mary M. Abate</u>, Assistant Chief, Court of Federal Claims Section , Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.

## OPINION and ORDER

CAMPBELL-SMITH, Chief Judge

This is a tax refund case.  Dynetics, Inc. (Dynetics or plaintiff) is an engineering company headquartered in Huntsville, Alabama.  Plaintiff filed amended tax returns for three tax periods seeking a refund based on certain research tax credits to which it claims entitlement under § 41 of the Internal Revenue Code (I.R.C.), which governs "Credit for increasing research activities."  I.R.C. § 41.  Defendant, the Internal Revenue Service (IRS or defendant), disallowed plaintiff's refund claims.

On September 7, 2012, plaintiff timely filed its complaint in this court.  While plaintiff's complaint is based on tax refunds it claims for work performed on more than

100 contracts, the parties have asked this court to evaluate plaintiff's claims on only 7 of those contracts, which the parties refer to as sample contracts.

While a taxpayer must establish a number of elements to qualify for a research tax credit under § 41, at this point in the case, the parties seek the court's assistance with resolving their dispute on only one such element.  Under § 41, a taxpayer may not claim a research tax credit if that research was "funded by any grant, contract, or otherwise by another person (or governmental entity)."  I.R.C. § 41(d)(4)(H).

Presently before the court are the parties' fully briefed cross-motions for partial summary judgment on the funded research question, brought under Rule 56(a) of the Rules of the United States Court of Federal Claims (RCFC).  The parties ask this court to determine whether the research performed by Dynetics under each of the seven sample contracts was "funded" under the governing Internal Revenue Code and Treasury regulations.

After consideration of the parties' briefing and evidentiary support, the court **GRANTS** defendant's motion for partial summary judgment on the funded research question, and **DENIES** plaintiff's cross-motion for partial summary judgment on the funded research question.

I.      Background

A.      Cross-Motions for Partial Summary Judgment

Defendant filed a motion for partial summary judgment on the funded research question.  Def.'s Mot., Aug. 7, 2014, ECF No. 35-1.  Plaintiff filed its cross-motion for partial summary judgment on the funded-research question.  Pl.'s Mot., Aug. 20, 2014, ECF No. 37-1.  Defendant filed its response.  Def.'s Resp., Sept. 26, 2014, ECF No. 40.  Plaintiff filed a reply.  Pl.'s Reply, Oct. 22, 2014, ECF No. 41.

Defendant also filed various exhibits in support of its motion.  Exs. 1.1 to 69, ECF Nos. 30-2 to 32.9.  Plaintiff likewise supported its motion with both affidavits and exhibits.  Exs. A to P, ECF No. 37-2.

In reviewing the parties' briefing, there were several questions on which the court felt it would benefit from additional explanation.  Accordingly, on January 28, 2015, the court issued an order posing a number of questions to the parties, and requesting comment.  Order Supp. Br., ECF No. 42.

On February 19, 2015, each party filed a supplemental brief in support of its motion for partial summary judgment. Pl.'s Supp. Br., ECF No. 45; Def.'s Supp. Br., ECF No. 46. On February 26, 2015, each party filed a reply. Pl.'s Reply to Def.'s Supp. Br., ECF No. 47; Def.'s Reply to Pl.'s Supp. Br., ECF No. 48.

The court is grateful to both parties for their supplemental briefing, which has been helpful in resolving their cross-motions.

B.    Sample Contracts

Each of the sample contracts is known by an alpha-numeric code assigned by Dynetics for internal contract management purposes. Like the parties, the court refers to each contract by this code.

Dynetics was awarded the AF007 contract (contract no. F08630-03-C-0034) by the United States Air Force Research Laboratory, pursuant to which it was "to develop and test 14 tailkits capable of carrying 21,600 pound of ammunition for deployment at a specified target." Ex. 12; Pl.'s Mot. 38. The AF007 contract was a cost-plus-fixed-fee contract. Id. at DYN 953.

The AMS01 contract (subcontract no. 017-O2K1) was issued to Dynetics by Aviation & Missile Solutions, LLC (AMS) as a subcontract. Ex. 51, at DYN 7568. The prime contract was issued to AMS by the U.S. Army Aviation and Missile Command (AMCOM). Id. at DYN 7569. AMCOM is a specialized research and development command with the Army Research Development and Engineering Command. Pl.'s Mot. 42. AMS is a joint venture between Dynetics and one other company, Camber. Id. at 43. The work performed by Dynetics under the AMS01 contract was performed on task orders issued as fixed-price-level-of-effort. Id. at 45-46; Def.'s Mot. 38. According to Dynetics, work on the AMS01 contract included "develop[ing] models and simulations to evaluate the effectiveness of missile defense systems, [as well as] developing technology and designing hardware that would enable the integration of applicable devices onto applicable platforms. [In addition, Dynetics] designed, analyzed, and tested warheads, fuzes, fuse systems, and technologies to integrate fuzes and warheads in constrained weapons systems." Pl.'s Mot. 43.

The AR005 contract (contract no. DAAH01-02-C0080) was issued to Dynetics by the U.S. Army Aviation & Missile Command. Ex. 27, at DYN 58336. The AR005 contract included both fixed-price and cost-plus-fixed-fee line items. Id. at DYN 58339-41. As relevant to this motion, defendant objects only to expenses Dynetics claims under the cost-plus-fixed-fee line items. See Def.'s Mot. 27. According to Dynetics, its work

on the AR005 contract included developing "calibration shelters for Humvees that were deployed 'in theater'" by the Army.  Pl.'s Mot. 50.  The purpose of this project was to "make it easier for soldiers to calibrate their equipment in the field rather than evacuating it for calibration."  Id.

The BOE12 contract (contract no. 100267) was issued to Dynetics by The Boeing Company.  Ex. 40, at DYN 41546.  The BOE12 contract was a time-and-materials contract.  See id. at DYN 41557-58.  According to Dynetics, its work on the BOE12 contract included "assisting in the development of a system to defend the United States against long-range (i.e., intercontinental) ballistic missile attacks."  Pl.'s Mot. 59.

The NT001 contract (contract no. MDA908-99-D-0001) was issued to Dynetics by the Defense Intelligence Agency (DIA) Missile & Space Intelligence Center (MSIC).  Ex. 34, at DYN 8064.  DIA is a combat support agency within the U.S. Department of Defense.  The NT001 contract is a cost-plus-fixed-fee contract.  Id. at DYN 8067.  According to Dynetics, it was assigned tasks "associated with gaining an understanding [of] foreign missile systems and the United States' capability of defending against threats posed by those foreign systems."  Pl.'s Mot. 64.

The UAH01 contract (subcontract no. SUB2004-025) was issued to Dynetics by the University of Alabama, Huntsville (the University) as a subcontract.  Ex. 18, at DYN 1700.  A cooperative agreement was issued to the University by the National Aeronautics and Space Administration (NASA)/Marshall Space Flight Center.  Id. at DYN 1701.  The UAH01 contract was a cost-plus-fixed-fee level-of-effort contract.  Id. at DYN 1700.  Under the UAH01 contract, Dynetics performed various tasks in support of the National Space Science & Technology Center.  Pl.'s Mot. 70.

The AR009 contract (contract no. DAAH01-02-C-R170) was issued to Dynetics by the U.S. Army Aviation & Missile Command.  Ex. 47, at DYN 6933. The AR009 contract was a fixed-price level-of-effort contract.  Under the AR009 contract, Dynetics was asked to "design, develop, and test aerodynamic vehicles, including missiles, aviation systems, and targets [, and it] used aerodynamic engineering techniques to develop or design proposed missiles or analyze properties of proposed missiles."  Pl.'s Mot. 53 (internal citation omitted).

II.     Legal Standards

    A.      Jurisdiction

The United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort.  28 U.S.C. § 1491(a)(1)(2012).  This court has jurisdiction, concurrent with the district courts, over "[a]ny civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."  28 U.S.C. § 1346(a)(1); see also Intersport Fashions West, Inc. v. United States, 84 Fed. Cl. 454, 456-57 (2008) (finding jurisdiction over tax refund claim).  That the court has jurisdiction over plaintiff's claim is undisputed.

B.    Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  RCFC 56(a); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  A genuine dispute is one that "may reasonably be resolved in favor of either party."  Liberty Lobby, 477 U.S. at 250.  "As to materiality, the substantive law will identify which facts are material.  Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  Id. at 248.

The moving party carries the burden of establishing its entitlement to summary judgment.  Celotex Corp., 477 U.S. at 322-23.  Once that burden is met, the onus shifts to the non-movant to identify evidence demonstrating a dispute over a material fact that would allow a reasonable finder of fact to rule in its favor.  Liberty Lobby, 477 U.S. at 256.

In considering a motion for summary judgment, the court does not weigh each side's evidence but, rather, must draw all inferences in the light most favorable to the nonmoving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88 (1986).  Where, as here, the parties have filed cross-motions for summary judgment, the court evaluates each motion on its own merits and makes all reasonable inferences against the party whose motion is under consideration.  Marriot Int'l Resorts, L.P. v. United States, 586 F.3d 962, 968-69 (Fed. Cir. 2009).  To the extent there exists a genuine issue of material fact, both motions must be denied.  Id. at 969.

The court evaluates the parties' motions for partial summary judgment under these standards.

### C.   Tax Refund Claims

It is well settled that in a tax refund case, like this one, there is a presumption of the correctness of the findings of the Commissioner of Internal Revenue.  See, e.g., Bubble Room, Inc. v. United States, 159 F.3d 553, 561 (Fed. Cir. 1998); Estate of Rubinstein v. United States, 119 Fed. Cl. 658, 667 (2015) ("[T]he assessment made by the [IRS] is presumed to be correct and this places an obligation on the taxpayer . . . to rebut a presumption of correctness.") (quotation marks omitted).

> In a tax refund case, the ruling of the Commissioner of Internal Revenue is presumed correct. To rebut this presumption of correctness, the taxpayer must come forward with enough evidence to support a finding contrary to the Commissioner's determination.  In addition, the taxpayer has the burden of establishing entitlement to the specific refund amount claimed.

Bubble Room, Inc., 159 F.3d at 561 (internal citations omitted).  "[I]n a refund suit, a taxpayer has the burden of proving by a preponderance of the evidence that the assessment or determination is incorrect and the correct amount, if any, of tax." Cook v. United States, 46 Fed. Cl. 110, 116 (2000) (citing Helvering v.  Taylor, 293 U.S. 507, 515 (1935) ("[u]nquestionably the burden of proof is on the taxpayer")).

The court considers plaintiff's claim in light of these burdens of proof.

### D.   Research Tax Credit

The Internal Revenue Code specifies when a taxpayer may take a credit for "qualified research expenses (QREs)."  I.R.C. § 41(a)-(b).  Qualified research excludes "[a]ny research to the extent funded by any grant, contract, or otherwise by another person (or governmental entity)."  I.R.C. § 41(d)(4)(H) (funded research exception).

The regulations implementing § 41 similarly state that

> [q]ualified research does not include any research to the extent funded by any grant, contract, or otherwise by another (or governmental entity).  To determine the extent to which research is so funded, § 1.41-4A(d) applies.

Treas. Reg. § 1.41-4(c)(9)).  In turn, § 1.41-4A(d) further explains that research is funded under either of two circumstances.  First, research is funded if the taxpayer receives payment that is not "contingent on the success of the research."  Treas. Reg. § 1.41-4A(d)(1).

> Research does not constitute qualified research to the extent it is funded by any grant, contract, or otherwise by another person (including any governmental entity). All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded. Amounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research (see § 1.41-2(e)(2)) are not treated as funding.

Treas. Reg. § 1.41-4A(d)(1).  Under § 1.41-4A(d)(1), if a taxpayer is paid for the results of the research regardless of whether those results are successful, the research is funded, and the taxpayer is ineligible for a tax credit.  Alternatively, if payment is "contingent on the success of the research and thus considered to be paid for the product," the research is not funded, and the taxpayer is eligible for the tax credit, assuming satisfaction of remaining § 41 requirements.

Second, research is funded if the taxpayer performing research for another person or governmental entity "retains no substantial rights" in the research.  Treas. Reg. § 1.41-4A(d)(2).

> If a taxpayer performing research for another person retains no substantial rights in research under the agreement providing for the research, the research is treated as fully funded for purposes of section 41(d)(4)(H), and no expenses paid or incurred by the taxpayer in performing the research are qualified research expenses.  For example, if the taxpayer performs research under an agreement that confers on another person the exclusive right to exploit the results of the research, the taxpayer is not performing qualified research because the research is treated as fully funded under this paragraph (d)(2).  Incidental benefits to the taxpayer from performance of the research (for example, increased experience in a field of research) do not constitute substantial rights in the research.

Treas. Reg. § 1.41-4A(d)(2).

III.    Discussion – Whether Payment was Contingent on the Success of Research

Plaintiff makes a number of arguments in support of its position that the research it performed under each of the seven sample contracts was not funded, that is, it would be paid for the results of the research only if those results were successful.

First, plaintiff argues that it had an established course of dealing with its contracting partner in each of six sample contracts, in which, regardless of the plain terms of each contract, it was expected to produce a successful result in order to receive payment. Next, plaintiff argues that each of the seven sample contracts included either an inspection clause or a warranty clause that expressly put Dynetics at financial risk of not being paid unless the results of its research were successful. Plaintiff relies most heavily on these two arguments.

In addition, plaintiff argues that it faced certain risks if it failed to produce successful research, that termination clauses in each sample contract put it at risk of nonpayment, and that in the case of three sample contracts, the fact that the contract was initially issued as an undefinitized contract put it at risk.

Defendant responds in opposition to each argument, insisting that under each sample contract, Dynetics would be paid regardless of whether its research was successful or not. In addition, defendant argues that Dynetics failed to retain substantial rights in the results of its research for two sample contracts. Accordingly, argues defendant, even if Dynetics was able to show that its research was not funded for these two contracts, Dynetics would still be ineligible for the tax credit. Plaintiff disagrees, insisting it did retain substantial rights in the results of the research for both sample contracts.

The court considers plaintiff's arguments in turn, and then defendant's argument.

A.     Course of Dealing

Dynetics argues that a course of dealing existed between it and its contracting partner in each of six of the sample contracts at issue in this motion, through which it was obligated to deliver a particular result, not merely a number of hours of service or a level of effort.[1]

---

[1]     Dynetics makes no argument that a course of dealing existed for the UAH01 contract. See Pl.'s Mot. 70-73 (offering no course of dealing argument for the UAH01 contract); Pl.'s Reply 11-14 (making no argument that the UAH01 contract was ambiguous).

> Dynetics understood, based on its long-term relationships with its customers that it had to successfully produce a product within the estimated cost to receive any payment in some cases and to secure future work under the contract in other cases. In both circumstances, Dynetics bore the financial risk of failed research.

Pl.'s Mot. 22. In Dynetics' view, under the course of dealing established with its contracting partners, each of the six sample contracts functioned as a fixed-price contract under which Dynetics was obligated to "produce a product," and for which Dynetics would be paid a fixed price, regardless of its actual costs. See id.

Defendant argues first that plaintiff's course of dealing argument is parol evidence. Def.'s Resp. 15-16. The court may only consider such evidence if the contracts are ambiguous. Def.'s Resp. 15-16. Defendant insists they are not. Def.'s Resp. 15-16.

Second, defendant asserts that even if the court were to consider plaintiff's argument, the evidence might reflect that Dynetics "had a unilateral policy that it would continue performing research, at its own expense, in order to generate the desired outcome, after the ceiling price of a contract or task order had been reached," but such evidence falls well short of showing a "joint understanding" between Dynetics and its contracting partners. Id. at 16-17.

Defendant is correct as to both of its arguments.

1.   Parol Evidence

A party's "attempt to vary the clear meaning of [a contract] in accordance with the parties' course of dealing is improper under the parol evidence rule." Alves v. United States, 133 F.3d 1454, 1459 (Fed. Cir. 1998) (internal quotation marks omitted).

> When construing a contract, a court first examines the plain meaning of its express terms. The parol evidence rule is a rule of substantive law that prohibits the use of external evidence to add to or otherwise modify the terms of a written agreement "in instances where the written agreement has been adopted by the parties as an expression of their final understanding. The rule thus renders inadmissible evidence introduced to modify, supplement, or interpret the terms of an integrated agreement. Evidence of the parties' course of dealing constitutes this kind of parol evidence that is prohibited by the rule. If the terms of a contract are clear and unambiguous, they must be

given their plain meaning—extrinsic evidence is inadmissible to interpret
them.

Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375-76 (Fed. Cir. 2004)
(emphasis added) (internal citations and quotation marks omitted).

The Federal Circuit has described the circumstance in which a contract might be
deemed ambiguous. "When a contract is susceptible to more than one reasonable
interpretation, it contains an ambiguity. To show an ambiguity[,] it is not enough that the
parties differ in their respective interpretations of a contract term. Rather, both
interpretations must fall within a zone of reasonableness." Metric Constructors, Inc. v.
NASA, 169 F.3d 747, 751 (Fed. Cir. 1999) (internal citations and quotation marks
omitted).

Plaintiff initially made no argument that any of the six sample contracts were
ambiguous. See Pl.'s Mot. 22-23. In its reply brief, plaintiff argued that, assuming
contractual ambiguity was necessary for consideration of any course of dealing, each
contract was in fact ambiguous. See Pl.'s Reply 10-14.

Dynetics argues that during the briefing of this motion, the parties "have disagreed
about the rights and obligations of Dynetics and the United States pursuant to these
contracts . . . demonstrating that the contracts are unclear and ambiguous." Pl.'s Reply
11. Plaintiff is mistaken. The mere fact that the parties disagree is not evidence of
contractual ambiguity. See Metric Constructors, Inc., 169 F.3d at 751.

Plaintiff further argues that various contracts: (1) incorporate FAR provisions that
rely on a term that is never defined (AF007, AMS01, NT001); (2) contain more than one
inspection clause (AMS01 and AR009); (3) fail to include the appropriate inspection
clause (AR005); or (4) were modified frequently by the parties, suggesting a lack of
clarity (BOE12). See Pl.'s Reply 11-14.

Regarding the "undefined terms," Dynetics points to "best efforts" in various
contracts, "allowable cost" in at least the AF007 and NT001 contracts, and the basis for
invoice "approval" in at least the AMS01 contract. Even if the court were to assume that
ambiguity in the contracts existed, it would be a patent ambiguity, because the terms
about which plaintiff now complains are found in the FAR—the provisions of which are
incorporated expressly in the contract. Under the patent ambiguity doctrine, contract
ambiguities must be read in the government's favor due to the contractor's duty to
inquire. Gen. Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775, 781 (Fed. Cir. 1993).
The Federal Circuit has made clear that "[a]lthough we do not wish to penalize a

10

contractor because of a contract that was poorly drafted by the government, the very fact that [a] contract is patently ambiguous places a burden on the contractor to seek clarification. . . . [If the contractor] failed to do so[,] it must . . . lose on its claim . . . ." Interstate Gen. Gov't Contractors, Inc. v. Stone, 980 F.2d 1433, 1436 (Fed. Cir. 1992). Thus, even if a patent ambiguity existed, Dynetics could not benefit from it.

Further, Dynetics makes no argument regarding how the terms it now considers ambiguous are relevant to the question of whether any of the six sample contracts required Dynetics to produce a particular product, rather than to provide hours of service or a level of effort. And if the allegedly ambiguous terms on which Dynetics asks the court to focus do not speak to the issue of what the contracts required Dynetics to do, plaintiff's course of dealing argument is unavailing.

Regarding the inspection clauses, as discussed infra Parts III.B.–F, Dynetics' arguments do not persuade either that the inspection clauses put it at financial risk, or that it was unclear which inspection clause applied to which contract. Moreover, even if multiple or missing inspection clauses caused ambiguity—as Dynetics' claims—the ambiguity would be a patent ambiguity, and this fails to assist Dynetics. See Interstate Gen. Gov't Contractors, Inc., 980 F.2d at 1436.

That a contract is modified, as the BOE12 contract was many times, is not itself evidence of ambiguity. As plaintiff itself noted, "[t]he award of the [BOE12] contract did not authorize any work. Boeing would then modify the contract to add a new line item that would both allot funds and specify the work required to be done." Pl.'s Mot. 59-60.

Plaintiff makes no argument, nor could it, that the plain text of any of the six sample contracts was "susceptible to more than one reasonable meaning" as to whether Dynetics was responsible for delivering a particular result for the contracted price—as it would be in a fixed-price contract—or whether it was responsible only for delivering a certain number of hours of service or a certain level of effort—as it would be in the cost-reimbursement, time-and-materials, and fixed-price level-of-effort contracts at issue here. Plaintiff's attempts to identify ambiguities are not convincing. Accordingly, in deciding the parties' cross-motions for partial summary judgment, the court does not consider the parole evidence plaintiff seeks to introduce regarding its course of dealing with each of its six contracting partners.

Nonetheless, the court is mindful that the sample contracts at issue in this motion are but a few of the contracts at issue in this matter. Solely for the purpose of providing the parties with information that might prove useful to them in resolving their remaining

disputes, the court addresses plaintiff's course of dealing argument, including all evidence filed by Dynetics.[2]

2.      Whether a Course of Dealing Existed Between Dynetics and its Contracting Partners

Course of dealing relies on a "shared understanding" between the parties, which in certain situations can be used to clarify or supplement written contractual terms.  See Sperry Flight Sys. Div. of Sperry Rand Corp. v. United States, 548 F.2d 915, 923 (Ct. Cl. 1977) ("[A] course of dealing can supply an enforceable term to a contract (or may even supplement or qualify that contract) provided that the conduct which identifies that course of dealing can reasonably be construed as indicative of the parties' intentions—a reflection of their joint or common understanding.").

Plaintiff's evidence of a joint or common understanding is limited to affidavits, see Exs. B-I, six of which are provided by Dynetics' employees.  Defendant responds that "[f]or five of the contracts (AF007, AR005, BOE12, AR009, and AMS01), Dynetics presents evidence only of its own understanding of its commitments and obligations and no admissible evidence of the state of mind of the other contracting parties."

Review of each affidavit shows that defendant is correct, Dynetics either states its own unilateral contract management practices, or states its position on what it believes its contracting partner "understood."

To protect its reputation and demonstrate its commitment to providing desired results within its estimated costs, Dynetics would have taken any cost overruns out of its fee rather than ask the government for more money.

_____

[2]      Plaintiff filed eight affidavits in support of its course of dealing argument.  See Exs. B-I.  Defendant objects to the court's consideration of one affidavit in its entirety, as well as to specified paragraphs in the remaining affidavits.  Def.'s Objections to Evidence Submitted by Plaintiff in Support of Its Cross-Motion for Partial Summary Judgment, ECF No. 40-1 (Def.'s Objs.); Supplemental Declaration of Jason Bergmann in Opposition to Plaintiff's Cross-Motion for Summary Judgment, ECF No. 40-2.  As the court does not consider plaintiff's course of dealing argument in its resolution of the parties' cross-motions, it is unnecessary to rule on defendant's objections to plaintiff's evidence.  The parties should draw no inference as to the admissibility of plaintiff's evidence from the mere fact that for the limited purpose of assisting the parties in resolving the remainder of their disputes, the court considers plaintiff's evidence in its entirety.

12

Hug Aff. ¶ 19, Ex. E (AF007).

> Both Dynetics and the U.S. Army understood that Dynetics would rework any defective or unacceptable products produced under the AR005 contract at its own cost, regardless of whether the product was required by a fixed-price or cost-plus-fixed-fee CLIN.

Williams Aff. ¶ 14, Ex. D (AR005).

> During our relationship with Boeing, we made Boeing aware of Dynetics' commitment to delivery [of] technically superior products within the cost estimates provided.

Bendickson Aff. ¶ 25, Ex. I (BOE12).

> It was Dynetics' practice to rework any defective or unacceptable work product required by the contract at its own cost, regardless of the terms of the contract. [The U.S. Army] was aware of Dynetics' commitment to provide a technically superior product within the cost estimates, even if that meant reworking the product at its own cost.

Walker Aff. ¶ 22, Ex. H (AR009).

> [I]t was Dynetics' practice to finish any incomplete work or repair any deficient products at its own costs (regardless of whether Dynetics was technically obligated to do so under the contract), rather than risk losing future work under the Omnibus 2000 contract or any other contract with AMCOM.

Miller Aff. ¶ 29, Ex. C (AMS01).

> It was Dynetics' practice to rework defective or unacceptable deliverables at its own costs, regardless of whether the terms of the contract imposed this requirement on Dynetics.

Nicaise Aff. ¶ 14, Ex. G (All contracts).

Regarding the sixth contract, the NT001 contract with the Missile and Space Intelligence Center (MSIC), Dynetics filed affidavits from a current Dynetics employee

who was previously a MSIC employee, Patrick Keller, and a retired MSIC contracting officer, Steven Thomason.  See Exs. B (Thomason) & F (Keller).

Mr. Thomason affirms that he was the contracting officer for the NT001 contract during the relevant time period, July 1, 2002 through June 30, 2005.  Thomason Aff. ¶ 4. Mr. Thomason provided statements regarding his management of the NT001 contract.

> In working with Dynetics on the [NT001] Contract, I made it clear that I expected all tasks to be completed within the amount listed in each delivery order and that I would not modify the delivery orders to allot additional funds if Dynetics was unable to complete the task within the funds originally allotted, barring some unforeseen circumstance that was outside of Dynetics' control.

Thomason Aff. ¶ 15.

> Dynetics also knew if a deliverable for a task was incomplete or defective[,] it was unacceptable.  Furthermore, Dynetics was aware that I would expect the company to go back and rework any unacceptable deliverables at its own cost and that I would not authorize additional funds to rework a defective deliverable.

Id. ¶ 17.

Dynetics relied on these paragraphs in the Thomason affidavit to argue that "even if the [NT001] contract were not ambiguous, the long-term course of dealing, which had been accepted by both parties, would supplement the contract by reflecting the parties' intent."  Pl.'s Reply 14.  Dynetics is mistaken.  If the NT001 contract is not ambiguous, the court may not consider parol evidence, including the parties' alleged course of dealing.  See. e.g., Barron Bancshares, 366 F.3d at 1375-76.

Dynetics also failed to show that Mr. Thomason had the authority to make the types of changes to the NT001 contract that he asserts he made—that is, managing the contract effectively as a fixed-price contract, despite the fact that the express terms of the written contract provided for a cost-plus-fixed-fee contract.

The NT001 contract expressly incorporated a Limitation of Cost clause.  Ex. 34, at DYN 8099 ¶ I.75 (FAR 52.232-20 Limitation of Cost (Apr. 1984)).  In relevant part, FAR 52.232-20 provides that,

> [t]he Contractor is not obligated to continue performance under this contract (including actions under the Termination clause of this contract) or otherwise incur costs in excess of the estimated cost specified in the Schedule, until the Contracting Officer (i) notifies the Contractor in writing that the estimated cost has been increased and (ii) provides a revised estimated total cost of performing this contract.

FAR 52.232-20(d)(2).  Simply put, under the Limitation of Cost clause, if the allocated funds for the NT001 contract were exhausted, Dynetics was not obligated to continue work.  Dynetics argues that, in effect, Mr. Thomason had the authority to disregard the plain language of the contract, as provided in the Limitation of Cost clause, and compel Dynetics to produce unfunded work.  But Dynetics fails to show that Mr. Thomason had any such authority.

In fact, the express terms of the NT001 contract show otherwise.  The contractual terms indicate that such a change was outside of Mr. Thomason's authority, and that changes to the contract were to be made by written order.  The NT001 contract expressly incorporated a Changes clause enumerating the six type of changes a contracting officer, like Mr. Thomason, was authorized to make to the contract—by written order.  See Ex. 34, at DYN 8101 (incorporating FAR 52.243-2 Changes–Cost-Reimbursement (Aug. 1987) – Alternate II).  Those six changes were: (1) description of services to be performed; (2) time of performance; (3) place of performance; (4) drawings, designs, or specifications under certain circumstances; (5) method of shipment or packing of supplies; and (6) place of delivery.  FAR 52.243-2 Alt. II.

Nothing in the Changes clause could be read to authorize a contracting officer to make any change to the NT001 contract other than by "written order."  Furthermore, nothing in the Changes clause could be read to authorize a contracting officer to override the express terms of the contract and to change it from a cost-plus-fixed-fee contract to a fixed-price contract—by either written order or oral understanding.  The changes to the NT001 contract for which Dynetics relies on Mr. Thomason's affirmations are beyond his authority, as set forth in the Changes clause, and nothing in the record suggests that Mr. Thomason had authority over the NT001 contract beyond that provided in the Changes clause.  See Thomason Aff. ¶¶ 7-8 (describing contracting officer duties and authority).  In addition, nothing in the record suggests that Mr. Thomason, a former MSIC employee, had authority to present MSIC's position on its management of the NT001 contract.

Dynetics also filed an affidavit from Mr. Keller, who in his previous role as

MSIC Deputy Director was responsible for the overall execution of the MSIC's mission. Keller Aff. ¶ 4.  Mr. Keller affirmed that "his primary area of expertise is the technical aspects of the weapons systems involved in the [Defensive Systems Analysis] contracts." Id. ¶ 5.  Mr. Keller did not state that he had any personal knowledge about or involvement with the NT001 contract during his MSIC employment, or for that matter, during his current employment with Dynetics.  The only mention of the NT001 contract by Mr. Keller was his statement that "Contract MDA908-99-D-0001 was one of DSA contracts awarded to Dynetics by MSIC.  It was issued to Dynetics in 1999 and was given the project code NT001 by Dynetics."  Id. ¶ 6.  While true, this statement provides no support for Dynetics' assertions of a course of dealing under the NT001 contract.

As defendant correctly points out, Dynetics has failed to provide the requisite evidence of any "joint understanding" between it and each of its contracting partners. Def.'s Resp. 16-17.

3.      "All Agreements"

Finally, Dynetics argues that the Treasury regulations "require" the court to consider the "agreements" it had with its contracting partners.  See Pl.'s Reply 10. Dynetics insists:

> [T]he course of dealing and understandings with the government reflect agreements between Dynetics and the government with respect to the research and development done under the contracts. These "agreements" are required to be considered by the Treasury Regulations. Treas. Reg. § 1.41-4A(d)(1) ("All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded.").  Therefore, even if not permitted in the contract interpretation context, the course of dealing must be considered pursuant to the Treasury Regulations when determining the "funding" issue.

Id.  But, Dynetics is mistaken; the Treasury regulations require no such thing.  First, Dynetics assumes what it seeks to prove, in particular, that it had an "agreement" with any of the six contracting partners for which it has pressed this argument.  Second, the agreement contemplated in the Treasury regulation is not present here.  The term "agreement" is defined in the FAR, which governs government contracts like those at issue here.  An "agreement" is defined as a "written instrument of understanding," that is "not a contract."  FAR 16.702(a), 16.703(a).  Clearly, the reference to "agreements" in

the Treasury regulations does not encompass what Dynetics asserts is a course of dealing between it and its contracting partners.

For all these reasons, if any of the six sample contracts were ambiguous, which they are not, <u>see</u> <u>supra</u> Part III.A.1., and the court considered plaintiff's affidavits in their entirety, a question on which it makes no decision, <u>see</u> <u>supra</u> note 2, plaintiff's evidence would still fail to show a joint understanding that would support a finding that a course of dealing existed between Dynetics and any of its contracting partners in the AF007, AR005, NT001, BOE12, AR009, or AMS01 contracts.

B.      Inspection Clauses – AF007 and NT001 Contracts

Incorporated into the AF007 contract as the inspection clause is FAR 52.246-8 Inspection of Research and Development–Cost-Reimbursement (May 2001).  Ex. 12, at DYN 957.  Dynetics argues that this inspection clause is like one at issue in the contract discussed in <u>Fairchild Industries, Inc. v. United States</u>, 71 F.3d 868, 873 (Fed. Cir. 1996). Given the similar inspection clauses, Dynetics urges that its contract is like the contract in <u>Fairchild</u>, which the Federal Circuit found "demonstrate[d] the shift of risk to the contractor."  Pl.'s Mot. 41 (citing <u>Fairchild</u>, 71 F.3d at 873).

Dynetics is mistaken in its reading of <u>Fairchild</u>.  The flaw in Dynetics' position is that it assumes the Federal Circuit based its decision on the incorporated inspection clause alone.  The appellate court did not.  Rather, it clearly based its decision on the text of the contract, as well as on the inspection, rejection, and payment clauses incorporated into the contract.  <u>Fairchild</u>, 71 F.3d at 871 ("The . . . contract provided that the Air Force was obligated to pay for the research only if Fairchild produced results that met the contract specifications, in accordance with certain provisions of the Defense Acquisition Regulations (DAR).").

The contract between Fairchild and the Air Force called for Fairchild to produce two prototype aircraft, according to a "contract [that] contained over 1,000 pages of technical specifications that required Fairchild to meet specific design, construction, quality, and performance standards."  <u>Fairchild</u>, 71 F.3d at 870.  The contract included express language by which Fairchild accepted responsibility for producing the prototype aircraft, known as a Next Generation Trainer (NGT).  According to the contract, "[t]he contractor hereby accepts Total System Responsibility for the NGT System," with "total system responsibility" defined as the

> responsibility for the installation and integration of the NGT system
> elements, i.e., its systems, subsystems, components, support equipment, and

> software/data; <u>including the responsibility for undertaking any and all actions necessary to assure that the total system will meet all requirements as defined in the system specification . . . as identified in . . . this contract.</u>

<u>Fairchild</u>, 71 F.3d at 871 (emphasis added).  Thus according to the contract language, Fairchild <u>explicitly</u> accepted responsibility for doing whatever was necessary to produce prototype aircraft in compliance with the contract specifications.  See <u>Fairchild</u>, 71 F.3d at 870.  Unlike the contractor in <u>Fairchild</u>, Dynetics makes no assertion that it expressly accepted contractual responsibility for producing any product.

The Federal Circuit in <u>Fairchild</u> also relied on two DAR provisions that were incorporated into the contract:  one governing inspection and rejection, DAR 7-302.4, and the other covering payments, DAR 7-302.2.[3]  "If the work was deemed unacceptable, the Air Force could either (1) reject the work, (2) require Fairchild to correct the work at its own expense, or (3) accept the work subject to an equitable price reduction."  <u>Fairchild</u>, 71 F.3d at 870 (citing DAR 7-302.4 (1976)).  Fairchild would be paid for "work product delivered and accepted."  <u>Fairchild</u>, 71 F.3d at 870 (citing DAR 7-302.2 (1976)).

The <u>Fairchild</u> inspection clause, which included rejection language, is included below.

> (a) All work under this contract shall be subject to inspection and test by the Government, to the extent practicable, at all times (including the period of performance) and places, and in any event prior to acceptance. . . .

> (b) <u>The Government may reject any work that is defective or otherwise not in conformity with the requirements of this contract</u>.  If the Contractor fails or is unable to correct or to replace such work within the delivery schedule or such later time as the Contracting Officer may authorize, the Contracting Officer may accept such work at a reduction in price which is equitable under the circumstances.

---

[3]    The Defense Acquisition Regulations (DAR) were included as Title 32 of the Code of Federal Regulations until April 1, 1984.  See <u>FMC Corp. v. United States</u>, 853 F.2d 882, 884 n.2 (Fed. Cir. 1988).  Thus, the cited DAR are available as 32 C.F.R. § 7-302.4 and 32 C.F.R. § 7-302.2.

DAR 7-302.4 (a)-(b) (emphasis added).

The relevant portion of FAR 52.246-8, the inspection clause incorporated into the AF007 contract—on which Dynetics relies, is as follows: "The Government has the right to inspect and test all work called for by the contract, to the extent practicable at all places and times, including the period of performance, and in any event before acceptance." FAR 52.246-8(c). Dynetics is correct that the inspection language in FAR 52.246-8(c) is like that found in DAR 7-302.4(a), the provision at issue in the Fairchild case. But the rejection language found in DAR 7-302.4(b) is wholly absent from FAR 52.246-8, and Dynetics makes no assertion that such language was incorporated independently into the AF007 contract.

Finally, the payments clause in the Fairchild contract provided that "[t]he Contractor shall be paid . . . [at] the prices stipulated herein for work delivered or rendered and accepted . . . ." DAR 7-302.2.

The payments clause incorporated in the AF007 contract is FAR 52.216-7 Allowable Cost and Payment (Dec. 2002). See Ex. 12, at DYN 964. Dynetics makes no argument that the payments clause in the AF007 contract included similar language to the payment clause in Fairchild that limited payment to work that the government "accepted." Nor is such language apparent in a review of FAR 52.216-7.

The Federal Circuit found that Fairchild was entitled to the research credit, because "[t]he contract explicitly placed solely on Fairchild the risk of failure of every line item . . . . The items to be produced were not commodities: all required research, development, and testing, to meet complex contract specifications." Fairchild, 71 F.3d at 873. The same cannot be said of the AF007 contract. Dynetics did not bear such risk.

Notwithstanding Dynetics' arguments to the contrary, any similarity between the AF007 contract and the contract in Fairchild is limited to the inspection clause. The AF007 contract included no language that directed Dynetics to accept responsibility for producing a product. The AF007 contract did not include rejection language; nor did it limit payment to work the government accepted. The limited similarity between the inspection clauses does not support a finding that the AF007 contract was like the contract in Fairchild. Throughout its arguments based on the various inspection clauses relevant to the sample contracts, Dynetics has attempted to liken the sample contracts to the contract in Fairchild. For the same reasons discussed herein, none of the sample contracts are like the contract in Fairchild.

Dynetics adds that it was put at financial risk by the plain text of certain other provisions in FAR 52.246-8, insisting that

> FAR § 52.246-8 gives the government the right [to] require replacement or correction of "work not meeting contract requirements." FAR § 52.246-8(f). Furthermore, if the contractor fails to proceed with "reasonable promptness to perform required replacement or correction, the Government may (i) [b]y contract or otherwise, perform the replacement or correction, [and] charge the Contractor any increased cost." FAR § 52.246-8(g)(1).

Pl.'s Mot. 41. But, Dynetics has not fully considered the FAR provision on which it relies.

FAR 52.246-8(f) provides that

> [a]t any time during contract performance . . . the Government may require the Contractor to replace or correct work not meeting contract requirements. . . . Except as otherwise provided in paragraph (h) below, the cost of replacement or correction shall be determined as specified in the Allowable Cost and Payment clause, [FAR 52.216-7] but no additional fee shall be paid.

FAR 52.246-8(f).

A review of FAR 52.216-7, the payments clause incorporated into the AF007 contract, shows that reimbursable costs include those "for items or services purchased directly for the contract." FAR 52.216-7(b)(1)(i). There is no mention of excluding costs incurred to replace or correct work not meeting standards. As defendant correctly points out, while the contractor will be paid "no additional fee" for replacement or correction, "the denial of a 'fee' merely limits the contractor's <u>profit</u> for the corrective work, but it does not preclude the contractor from recovering its <u>costs</u>." Def.'s Resp. 11. Dynetics makes no assertion that in replacing or correcting its work it would not be paid. Nor does the language of FAR 52.246-8(f) support such a position.

Under FAR 52.246-8(g), the government may charge the contractor for "increased cost" if the government has to perform the replacement or correction. FAR 52.246-8(g)(1)(i). However, as Dynetics correctly states, the government may only do so "[i]f the Contractor fails to proceed with reasonable promptness to perform required replacement or correction." <u>Id.</u> Dynetics could be at financial risk under FAR 52.246-8(g)(1), but <u>only</u> if it "fails to proceed with reasonable promptness" to make the replacement or correction. FAR 52.246-8(g)(1). And, this risk is not attributable to the

failure of the research, which is the <u>sole</u> risk relevant to the tax credit.  <u>See</u> Treas. Reg. § 1.41-4A(d)(1) ("Amounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research . . . are not treated as funding.").

Dynetics' arguments that FAR 52.246-8, as incorporated into the AF007 contract, put it at financial risk are unpersuasive.

The NT001 contract incorporated FAR 52.246-5 Inspection of Services–Cost-Reimbursement (Apr. 1984).  Ex. 34, at DYN 8075.  The inspection language in FAR 52.246-5(c) is identical to that in the inspection clause incorporated into the AF007 contract, FAR 52.246-8(c), with the exception that FAR 52.246-5(c) provides for the inspection of "services," rather than "work."

As it did with the AF007 contract, Dynetics argues that the inspection language in the NT001 contract, which incorporates FAR 52.246-5(c), is similar to that in DAR 7-302.4(a) and puts it at the same risk as in <u>Fairchild</u>.  Pl.'s Mot. 68.  But, as previously discussed, any similarity in the inspection language of FAR 52.246-5(c) and DAR 7-302.4(a), without more, is insufficient to put Dynetics at financial risk.

C.      Inspection Clauses – AR009 and AMS01 Contracts

The AR009 contract expressly incorporated two different clauses for inspection of research and development; one pertained to fixed-price contracts (FAR 52.246-7) and the other to cost-reimbursement contracts (FAR 52.246-8).  Ex. 47, DYN 6946.  The AR009 contract is a firm-fixed-price, level-of-effort contract (FFP-LOE) for labor costs.  <u>See</u> <u>id.</u> at DYN 6954.

The AMS01 contract expressly incorporated four different inspection clauses, respectively for fixed-price contracts (FAR 52.246-4), cost-reimbursement contracts (FAR 52.246-5), time-and-material and labor-hour contracts (FAR 52.246-6) and research and development contracts (short form) (FAR 52.246-9).  <u>See</u> Ex. 51, at DYN 7579.  Plaintiff explained that multiple inspection clauses were included in the AMS01 contract because the contract permitted "fixed rate[], fixed-price and/or cost plus fixed fee task orders."  Pl.'s Supp. Br. 17 (quoting Ex. 51, at DYN 7570).  The parties agree that there are only five task orders at issue under the AMS01 contract, and all are FFP-LOE.  Pl.'s Mot. 45-46 ("Each task order was issued on a fixed-price level of effort

basis.");[4] Def.'s Mot. 38 ("The five task orders provided for work on a fixed-rate level-of-effort basis.").

In arguing that it was put at financial risk by the inspection clause contained in each contract, Dynetics relied only on the fixed-price inspection clauses.  See Pl.'s Mot. 58 (FAR 52.246-7 under AR009); Id. at 49 (FAR 52.246-4 under AMS01).  But, plaintiff did not explain how it could be at financial risk under any inspection clause, given the definition of a FFP-LOE contract provided in the FAR:

> A firm-fixed-price, level-of-effort term contract is suitable for investigation or study in a specific research and development area. The product of the contract is usually a report showing the results achieved through application of the required level of effort. However, payment is based on the effort expended rather than on the results achieved.

FAR 16.207-2 Firm-Fixed-Price, Level-of-Effort Term Contracts – Application (emphasis added).  The court asked the parties to reconcile arguments based on the fixed-price inspection clauses with the definition of a FFP-LOE contract provided in FAR 16.207-2.  See Order Supp. Br. 4-5.

Dynetics responded that "in the case of both the AR009 and AMS01 contracts, the government defined deliverables that were expected as a pre-requisite to payment."  Pl.'s Supp. Br. 14-15.  While acknowledging that "in theory" a contractor could satisfy FFP-LOE contract requirements by providing a specified level of effort, Pl.'s Supp. Br. 14, Dynetics argued that the AR009 and AMS01 contracts were not "typical" FFP-LOE contracts.  Pl.'s Reply to Def.'s Supp. Br. 10.  Rather, in Dynetics' view, both contracts "appear to be hybrids, calculating a fixed price based on effort, but requiring delivery of specified items as a condition for payment."  Id.

As an example of deliverables, Dynetics points to Technical Directive Order 8 (TDO 8) issued under the AR009 contract, which required Dynetics to "develop and deliver a long list of hardware items."  Pl.'s Supp. Br. 15 (citing Ex. 48, at DYN 62475).  Review of TDO 8 shows that Dynetics is correct.  TDO 8 required Dynetics' effort on "Flight Hardware Fabrication" in support of "several flight tests to demonstrate

---

[4]     In its supplemental briefing, Dynetics seems to argue the task orders were fixed price, rather than firm-fixed-price, level-of-effort.  See Pl.'s Supp. Br. 17-18.  The record is clear, however, that the five task orders were firm-fixed-price, level-of-effort, with the government purchasing a specified number of labor hours.  See Ex. 52, at 64293 (Task Order 27); Ex. 53, at DYN 64342 (Task Order 34); Ex.54 at DYN 64555 (Task Order 53); Ex. 55 at DYN 65341 (Task Order 60); Ex. 56 at DYN 65373 (Task Order 64).

hypervelocity performance." Ex. 48, at DYN 62475. Dynetics was required to "fabricate to print . . . hardware items in accordance with the design drawings provided . . . ." Id. A list of twenty different hardware items, in various quantities, followed. Id. at DYN 62475-76.

According to Dynetics, "[s]eeking specified deliverables is directly contrary to the applicable uses of [a] FFP-LOE [contract] under the FAR, which states that this contract form may only be used where 'the work cannot otherwise be clearly defined.'" Pl.'s Supp. Br. 15 (quoting FAR 16.207-3(a)). Plaintiff is mistaken, however, in its reliance on this provision of the FAR.

The AR009 contract is a research & development contract. Ex. 47, at DYN 6933 item 15 ("Kind of Contract: Research and Development Contract"). As used in FAR Part 35 (Research and Development Contracting), the term "development" means

> the systematic use of scientific and technical knowledge in the design, development, testing, or evaluation of a potential new product or service (or of an improvement in an existing product or service) to meet specific performance requirements or objectives. It includes the functions of design engineering, prototyping, and engineering testing. . . .

FAR 35.001. Part 35 of the FAR governing "contracting methods and contract type" provides that a FFP-LOE contract "may be useful for," inter alia, "developing system design concepts." FAR 35.006(d) (citing FAR 16.207, Firm-Fixed-Price, Level-of-Effort term contracts). Thus, a FFP-LOE contract is contemplated for development, and development includes prototyping and engineering testing, all of which require production of hardware. Contrary to Dynetics' assertion, a specific deliverable does not contravene the FAR provisions governing FFP-LOE contracts.

Dynetics adds that under the AMS01 contract, the government "likewise sought specific deliverables." Pl.'s Supp. Br. 17. Unlike in its argument for the AR009 contract, Dynetics provided no specific examples from the task orders in the record. Regardless, for the reasons explained above, any argument based on the mere requirement of a deliverable would be insufficient to show that the AMS01 contract was other than a FFP-LOE contract.

Dynetics also argued that both contracts seemingly functioned as hybrid contracts because the government permitted Dynetics to "vary its hours 'by plus or minus 10% provided the total price for that specific [Technical Directive Order] option exercise is not exceeded.'" Id. at 16 (citing Ex. 47, at DYN 6949). Dynetics reasons that "[i]f the

government was just buying the 'effort' there would be no reason to vary the hours, because hours would be all that Dynetics was providing." Id.

Review of the AR009 contract shows that the government specified the labor mix for each option, including the specific positions and the number of hours for each position. See Ex. 48, at DYN 6947. For example, an option would specify a certain number of hours of program manager time, senior engineer time, engineer time, etc. Id. As Dynetics correctly points out, the government allowed it to shift time from one position to another, for example by using more engineer time but less senior engineer time, provided it did not exceed the total dollar amount contracted for that option. Id. at DYN 6949. The government simply allowed Dynetics some flexibility and discretion in the labor mix of the "effort" it provided. Contrary to Dynetics' assertion, nothing in this labor mix flexibility shows the government was buying anything other than a level of effort.

Dynetics relied on a case from the U.S. Department of Agriculture Board of Contract Appeals (Board). In its briefing, Dynetics argued that the Board considered a contract "similar" to the AR009 and AMS01 contracts, and agreed "to treat the contract as firm-fixed-price, despite the contractor's claim that it understood the contract to be fixed-price, level of effort." Pl.'s Supp. Br. 18-19 (citing In re Mangi Envtl. Grp., Inc., AGBCA Nos. 2005-101-1, 2005-102-1, 2005-103-1, 06-1 BCA ¶ 33,233 (Mar. 7, 2006)).

In that case, the contractor attempts to argue—during a dispute over costs it incurred above the contract amount—that because it had understood the contract to be FFP-LOE, not fixed-price, it was entitled to recover payment for its costs above the contracted dollar amount. Mangi, Fact 22. The Board found that the contract was firm-fixed-price; that is what the contract expressly stated, and during the bidding process, the contractor had acknowledged as much, in writing. Accordingly, this board case provides Dynetics with no support.

Plaintiff has not shown that either the AR009 or AMS01 contract was anything other than a firm-fixed-price, level-of-effort contract. As plaintiff correctly acknowledged, in such a contract, the contractor only needs to provide a certain level of effort in order to be paid for its work. See Pl.'s Reply to Def.'s Supp. Br. 10. Dynetics has not shown that it was put at financial risk by the terms of any inspection clause incorporated into either the AR009 or AMS01 contract.

D.     Inspection Clause – AR005 Contract

The AR005 contract includes three different line items, fixed price, cost-plus-fixed-fee and cost-reimbursement.  The fixed-price line items provided for hardware production, the cost-plus-fixed-fee line items covered a specified number of hours of engineering services, and the cost-reimbursement line items supported travel and other direct expenses.  (The latter two are referred to collectively as cost-reimbursement line items.)  See, e.g., Ex. 27, at DYN 58339-42.

Defendant objects only to expenses under the cost-reimbursement line items; it makes no objection to expenses under the fixed-price line items.  Def.'s Mot. 27.  According to defendant, Dynetics claimed QREs for wages in various amounts for each of the three tax years at issue in this motion, and these are the expenses for which defendant argues Dynetics may not take a tax credit under the AR005 contract.  See id.

The AR005 contract incorporated only one inspection clause—FAR 52.246-2 Inspection of Supplies–Fixed-Price (Aug. 1996).  See Ex. 27, at DYN 58356.  Defendant acknowledges that the absence of an inspection clause for the cost-reimbursement line items was an "oversight," Def.'s Reply to Pl.'s Supp. Br. 9, likely attributable to the fact that the initial undefinitized AR005 letter contract expressed the intent of the Army to enter a fixed-price contract, which included no line items for engineering services, see Ex. 26, at DYN 36187-90.  Regardless of the reason, it is apparent that the AR005 contract includes both fixed-price and cost-reimbursement line items, while including only a fixed-price inspection clause.  The parties disagree on the consequence of this oversight.  Defendant has correctly described each party's position as follows:

> Defendant contends that the fixed-price clauses apply by their terms only to the fixed-price CLINs, and the Court should read certain mandatory but omitted cost-reimbursement FAR clauses into the contract under the Christian doctrine.[5]  Disagreeing, Dynetics suggests that the Court must apply the specific fixed-price clauses in the AR005 Contract both to the fixed-price and cost reimbursement CLINs.

Def.'s Reply to Pl.'s Supp. Br. 9 (footnote added).

---

[5]    "Under the Christian doctrine, a court may insert a clause into a government contract by operation of law if that clause is required under applicable federal administrative regulations."  Def.'s Resp. 4-5 (quoting Gen. Eng'g & Mach. Works v. O'Keefe, 991 F.2d 775, 779 (Fed. Cir. 1993); see also G.L. Christian & Assocs. v. United States, 160 Ct. Cl. 1, 12 (1963)  (holding that "there was a legal requirement that the plaintiff's contract contain the standard termination clause and the contract must be read as if it did")).

The court first considers plaintiff's argument that FAR 52.246-2 applies to the expenses for which it seek a tax credit, wages for engineering services. FAR 52.246-2 governs the inspection of "supplies," which "includes but is not limited to raw materials, components, intermediate assemblies, end products, and lots of supplies." FAR 52.246-2(a). Dynetics failed to offer an explanation as to how wages for engineering services could fall within the definition of supplies provided in FAR 52.246-2.

Rather, Dynetics' approach was to argue that, notwithstanding that the line items in the AR005 contract were labeled expressly "cost plus fixed fee" e.g., Ex. 27, at DYN 58340, the contract as a whole was a firm-fixed-price contract, and thus the fixed-price inspection clause, FAR 52.246-2, must apply to every line item. See Pl.'s Supp. Br. 9 ("Because [FAR 52.246-2] is the only [inspection] clause specifically incorporated into the contract, it is relevant to the question of whether all of the work performed under the AR005 contract is funded. . . . "); Pl.'s Reply to Def.'s Supp. Br. 4 ("The AR005 contract is designated by the government as "Firm-Fixed-Price", notwithstanding the fact that certain CLINs are paid on a cost reimbursement basis.) (internal citation omitted).

In support of this argument, Dynetics points to the first page of the AR005 contract, which is a form contract, Standard Form 30 (SF 30). See Pl.'s Reply to Def.'s Supp. Br. 4 (citing Ex. 27, at DYN 58336). Item 1 on the first page of that contract is a small box labeled "Contract ID Code," below which are the typed words "Firm-Fixed-Price." Ex. 27, at 58336. In effect, Dynetics argues that the words typed into Item 1 state what type of contract the AR005 contract is. Review of the SF 30, and its instructions, shows that Dynetics is mistaken.

The SF 30 and its instructions are available in the FAR. See FAR 53.301-30 (Standard Form 30, Amendment of Solicitation/Modification of Contract). The following instruction is provided for SF 30 Item 1: "Item 1 (Contract ID Code). Insert the contract type identification code that appears in the title block of the contract being modified."[6]

Thus, the term "firm fixed price" describes the "contract being modified," that is the earlier undefinitized letter contract, Ex. 26, not the definitized AR005 contract at issue in this motion, Ex. 27. That the undefinitized letter contract was a firm-fixed-price contract is undisputed. It is also irrelevant to this motion, as that contract included no line items for engineering services, the only disputed expenses in this motion.

---

[6]    A copy of the form is also available on the General Services Administration (GSA) website. GSA, http://www.gsa.gov/portal/forms/download/116158 (search "SF 30") (last visited May 22, 2015).

Dynetics has failed to show either that the AR005 contract was a fixed-price contract, or that the wage expenses for which it seeks a tax credit were supplies which could fall within the fixed-price inspection clause, FAR 52.246-2, as incorporated in the AR005 contract.  Accordingly, it is unnecessary to consider defendant's alternative argument that the court should incorporate certain FAR provisions in the AR005 contract as a matter of law under the <u>Christian</u> doctrine.

E.      Warranty Clause – BOE12 Contract

Dynetics asserts it was put at financial risk under the Rejection, Warranty for Services, and Warranty for Materials paragraphs of the Boeing Company General Provisions for Labor Hour/Time & Material Contracts (GP3).  <u>See</u> Pl.'s Mot. 63-64 (citing Pl.'s Ex. L ¶ 9 (Rejection), ¶ 11 (Warranty for Services), and ¶ 12 (Warranty for Materials)).  The GP3 is expressly incorporated into the BOE12 contract.  <u>See</u> Ex. 40, at DYN 41546, 41557-58.

Dynetics argues it was at financial risk because Boeing could reject nonconforming services, and could either require Dynetics to reperform at its own expense, or could obtain replacement services and charge Dynetics the cost for doing so.  <u>See</u> Pl.'s Mot 63 (citing Pl.'s Ex. L ¶¶ 9(a), 9(b), 11).  Likewise, Dynetics argues that it was responsible for correcting or replacing nonconforming materials at its own expense.  <u>See</u> <u>id.</u> (citing Pl.'s Ex. L ¶ 12).

The relevant clauses of the GP3 are included below.

REJECTION

a. If Seller [Dynetics] delivers nonconforming Services, Buyer [Boeing] may require Seller to promptly correct or replace the nonconforming Services. Redelivery to Buyer of any corrected or replaced Services shall be at Seller's expense, limited to Seller's hourly rate as set forth in this contract, excluding that portion of the rate attributable to profit.
b. In addition Buyer may (i) correct the nonconforming Services or (ii) obtain replacement Services from another source at Seller's expense.

Pl.'s Ex. L ¶ 9(a)-(b).

WARRANTY FOR SERVICES.  Seller warrants that all Services performed hereunder shall be performed by employees or agents of Seller who are experienced and skilled in their profession and in accordance with industry

standards.   Seller further warrants that all Services performed under this contract, at the time of acceptance, shall be free from defects in workmanship and conform to the requirements of this contract.   Buyer shall give written notice of any defect or nonconformance to Seller within one year from the date of acceptance by Buyer.   ["**First provision**"] Buyer may, at its option, either (a) require correction or reperformance of any defective or nonconforming Services, or (b) make an equitable adjustment in the price of this contract.   If Seller is required to correct or reperform the Services, such correction or reperformance shall be at Seller's expense.   Any Services corrected or reperformed shall be subject to this article to the same extent as work initially performed. ["**Second provision**"] If Seller fails or refuses to correct or reperform, Buyer may correct or replace with similar Services and charge Seller for any cost to Buyer, or make an equitable adjustment in the price of this contract.

Id. ¶ 11 (annotation added).

WARRANTY FOR MATERIALS

(a). . . . Buyer may, at its option, either (i) return for credit or refund or (ii) require prompt correction or replacement of the defective or nonconforming materials.  Return to Seller of defective or nonconforming materials and redelivery to Buyer of corrected or replaced materials shall be at Seller's expense.

Id. ¶ 12.

1.      Paragraph 9(a) of the Rejection Clause and the "First Provision" of the Paragraph 11 Warranty for Services Clause

Review of paragraph 9(a) shows that while Dynetics is correct that Boeing may require it to "correct or replace the nonconforming [s]ervices," it is incorrect that Dynetics would be at financial risk in doing so.  Dynetics relies on the term "seller's expense," in paragraph 9(a).  See Pl.'s Mot. 63 ("Boeing could reject nonconforming services and require Dynetics . . . to "correct[] or replace[] Services . . . at Seller's expense.") (quoting Pl.'s Ex. L ¶ 9(a)).  But Dynetics omits mention of the fact that this term is defined as "limited to Seller's hourly rate as set forth in this contract, excluding that portion of the rate attributable to profit."

Thus when called upon by Boeing to correct or replace nonconforming services, Dynetics is first paid its full hourly rate for producing the initial nonconforming services, and is then paid its costs for reperforming those services, with the exception of its profit. This is like the inspection clause in the AF007 contract, FAR 52.246-8(f).  See supra Part III.B.  As discussed therein, the omission of further profit for reperforming nonconforming services is not the type of risk contemplated under the Treasury regulation.  Dynetics was not at financial risk under the plain text of paragraph 9(a).

In considering Dynetics' arguments under paragraph 11, it is apparent that the first provision in that Warranty for Services clause addresses the same point as paragraph 9(a) of the Rejection clause, that is Boeing's rights in the face of Dynetics' delivery of nonperforming services.  Reviewing the relevant sentences side-by-side is helpful in appreciating the similarity.

| Reperformance Requirement | |
|---|---|
| Rejection – Paragraph 9(a) | Warranty for Services – Paragraph 11 "First provision" |
| If Seller delivers nonconforming Services, Buyer may require Seller to promptly correct or replace the nonconforming Services.  Redelivery to Buyer of any corrected or replaced Services shall be at Seller's expense, limited to Seller's hourly rate as set forth in this contract, excluding that portion of the rate attributable to profit. | Buyer may . . . (a) require correction or reperformance of any defective or nonconforming Services . . . .  If Seller is required to correct or reperform the Services, such correction or reperformance shall be at Seller's expense. Any Services corrected or reperformed shall be subject to this article to the same extent as work initially performed. |

Pl.'s Ex. L ¶¶ 9(a), 11.  The only real difference between paragraphs 9(a) and 11 is the definition of "seller's expense."  Paragraph 11 fails to include the dependent clause "limited to Seller's hourly rate as set forth in this contract, excluding that portion of the rate attributable to profit."  In reading paragraph 11, the question is whether the term "seller's expense" should be read to include the definition set forth in paragraph 9(a).[7]

---

[7]     The court asked the parties to comment on the definition of seller's expense in paragraph 9(a), and whether this definition would apply in paragraph 11, and whether Dynetics would be at financial risk under this definition.  Order for Supp. Br. 4. Dynetics' response was limited to stating that it understood that any reference to "Seller" was a reference to Dynetics, followed by a repetition of its course of dealing argument. See Pl.'s Supp. Br. 13.

"[T]he rule of thumb [is] that a term generally means the same thing each time it is used," which is known as the presumption of consistent usage.  United States v. Castleman, 134 S. Ct. 1405, 1417 (2014).  However, "the presumption of consistent usage readily yields to context, and a statutory term—even one defined in the statute—may take on distinct [characteristics] from association with distinct statutory objects calling for different implementation strategies.  Utility Air Regulatory Grp. v. E.P.A., 134 S. Ct. 2427, 2441 (2014) (internal quotation marks omitted).

"The words of a contract are deemed to have their ordinary meaning appropriate to the subject matter, unless a special or unusual meaning of a particular term or usage was intended, and was so understood by the parties."  Lockheed Martin IR Imaging Sys., Inc. v. West, 108 F.3d 319, 322 (Fed. Cir. 1997).  "Under general rules of contract law we are to interpret provisions of a contract so as to make them consistent."  Abraham v. Rockwell Int'l Corp., 326 F.3d 1242, 1251 (Fed. Cir. 2003).  "[A]n agreement is not to be read in a way that places its provisions in conflict, when it is reasonable to read the provisions in harmony . . . .  [T]he provisions must be read together in order to implement the substance and purpose of the entire agreement."  Air-Sea Forwarders, Inc. v. United States, 166 F.3d 1170, 1172 (Fed. Cir. 1999).  "A reasonable interpretation must assure that no contract provision is made inconsistent, superfluous, or redundant."  Medlin Const. Group, Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (internal quotation marks omitted).

To read the term "seller's expense" in paragraph 11 without the paragraph 9(a) definition would mean that under paragraph 11, Dynetics must reperform at its own expense, which is directly at odds with the plain text of paragraph 9(a), which states that when reperforming, Dynetics will be paid its "hourly rate" (less its profit).

As both paragraphs 9(a) and 11 address the same point, under the presumption of consistent usage, the court would read the definition for seller's expense provided in paragraph 9(a) into paragraph 11.  Reading the paragraph 9(a) definition of seller's expense into paragraph 11 also permit the court to interpret the contract provisions consistently, without placing the two provisions in conflict with one another.  See Abraham, 326 F.3d at 1251; Air-Sea Forwarders, Inc., 166 F.3d at 1172.  The converse, reading the term seller's expense in paragraph 9(a) as it is written in paragraph 11, would render the dependent clause in paragraph 9(a) superfluous, making such an interpretation unreasonable.  See Medlin Const. Group, Ltd., 449 F.3d at 1200.

For these reasons, the court interprets the term "seller's expense" in paragraph 11 to have the same meaning as in paragraph 9(a), that is Dynetics would be paid its "hourly rate as set forth in this contract, excluding that portion of the rate attributable to profit."

Under this reading, as discussed earlier, Dynetics was not at financial risk when called upon to reperform nonconforming services.

> 2.     Paragraph 9(b) of the Rejection Clause and the "Second Provision" of the Paragraph 11 Warranty for Services Clause

We turn now to Dynetics' assertions of financial risk under paragraphs 9(b) and 11.  It is apparent that both paragraphs address the same points, Boeing's rights to correct nonconforming services or replace those services with a contractor other than Dynetics. Comparison of the two sentences side-by-side, however, reveals a significant difference.

| Boeing's Ability to Charge Dynetics for Replacement Services | |
| --- | --- |
| Rejection – Paragraph 9 (b) | Warranty for Services – Paragraph 11 "Second provision" |
| In addition Buyer may (i) correct the nonconforming Services or (ii) obtain replacement Services from another source at Seller's expense. | If Seller fails or refuses to correct or reperform, Buyer may correct or replace with similar Services and charge Seller for any cost to Buyer, or make an equitable adjustment in the price of this contract. |

Pl.'s Ex. L ¶¶ 9(b), 11.  In both paragraphs 9(b) and 11, Boeing has the right to charge Dynetics the cost of any replacement services it procured from another contractor.  Id. ¶ 9(b) ("Buyer may . . . obtain replacement Services from another source at Seller's expense."); Id. ¶ 11 ("If Seller fails or refuses to correct or reperform, Buyer may . . . replace with similar Services and charge Seller for any cost to Buyer.").  In paragraph 9(b), Boeing may resort to this option at any time.  Id. ¶ 9(b).  In paragraph 11, however, Boeing may do so only "[i]f [s]eller fails or refuses to correct or reperform."  Id. ¶ 11.

"When a contract is susceptible to more than one reasonable interpretation, it contains an ambiguity.  To show an ambiguity[,] it is not enough that the parties differ in their respective interpretations of a contract term.  Rather, both interpretations must fall within a zone of reasonableness."  Metric Constructors, Inc., 169 F.3d at 751 (internal citations and quotation marks omitted).

The plain text of paragraphs 9(b) and 11 are ambiguous as to when Boeing could charge Dynetics for its cost in securing replacement services—at any time, or only if Dynetics fails or refuses to correct or reperform.  The GP3 as a whole provides no further information on this point.  Either interpretation is within a zone of reasonableness.  See Metric Constructors, Inc., 169 F.3d at 751.

Under the doctrine of <u>contra proferentem</u>, any ambiguity in the BOE12 contract is to be construed against the drafter.  <u>See</u> <u>LAI Svcs., Inc. v. Gates</u>, 573 F.3d 1306, 1315 (Fed. Cir. 2009).  The BOE12 contract, including the GP3, was drafted by Boeing.  A review of the texts clearly indicates that paragraph 11 is in Dynetics' interest, and against Boeing's interest, because it limits the circumstances in which Boeing can go outside the contract to secure replacement services at Dynetics' expense.  For this reason, the court resolves the ambiguity between paragraphs 9(b) and 11 by reading the GP3 to permit Boeing to charge Dynetics for similar services it obtains as set forth in paragraph 11, "[i]f Seller fails or refuses to correct or reperform."

In arguing that it was put at financial risk under paragraph 11, Dynetics overlooks the portion of paragraph 11 that limits Boeing's right to charge Dynetics for replacement services <u>only</u> to when it first "fails or refuses to correct or reperform."  <u>See</u> Pl.'s Mot. 63 ("The warranty clauses of the General Provisions gave Boeing the right to request correction or performance of defective or nonconforming services at the Seller's expense . . . .") (citing Pl.'s Ex. L ¶ 11).  While Dynetics is at risk under paragraph 11, this risk results not from the failure of its research, but rather from any lack of response to a rejection of its nonperforming services—that is, by either its failure or refusal to correct or reperform.  <u>See</u> Pl.'s Ex. L ¶ 11.  This is not the risk contemplated by the Treasury regulation, which is limited to the failure of the research.  <u>See</u> <u>infra</u> Part III.G.

3.     Paragraph 12

Finally, Dynetics claims it is at risk under paragraph 12, under which it provided Boeing with a warranty for materials.  It is unclear, however, how risk under paragraph 12, if such risk exists, is relevant to this motion.  According to defendant, Dynetics claims only wages as the expenses for which it seeks a tax credit.  <u>See</u> Def.'s Mot. 33.  Dynetics says nothing to the contrary in its own motion.  <u>See</u> <u>id.</u> at 58-64.  If Dynetics seeks a tax credit only for wages, it is unclear how a warranty for materials would be relevant to the question of whether Dynetics was at financial risk in its research, for which it incurred only expenses for wages.  Dynetics says nothing on this point.

Having considered Dynetics' arguments based on paragraphs 9(a), 9(b), 11 and 12 of the GP3, the court finds Dynetics's arguments that it was put at financial risk under the warranty and rejection clauses of the BOE12 contract to be unpersuasive.

F.     Inspection Clause – UAH01 Contract

The warranty clause in the UAH01 contract is set forth in the contract itself; there are no relevant incorporated FAR provisions.  <u>See</u> Ex. 18, at DYN 1707 ¶ 1.  Dynetics

argues that "[w]hile the UAH01 contract did not include any inspection provisions,[8] the warranty provision, as governed by Alabama law, gave UAH a right to recover the price paid if the work delivered did not conform to the requirements of the contract."  Pl.'s Reply 8 (quotation marks omitted) (footnote added).

> The warranty clause on which Dynetics relies is included below in its entirety.

> Standard of Performance.  All services rendered by the Contractor and its employees, agents, or representatives in performance of this Contract shall conform to the highest standards of workmanship for the type of work involved.  Each of the Contractor's employees performing services under this Contract shall be well qualified for the services he or she is performing.  The Contractor warrants to the University that all work performed shall: (a) conform in all respects to all requirements of this Contract; (b) be free from all defects in materials and workmanship; and (c) be free from all defects in design and be fit for its intended purposes.

Ex. 18, at DYN 1707 ¶ 1.  Notably, the warranty clause includes no rejection or reperformance provisions.  In arguing it was at financial risk, Dynetics also relied on certain Alabama state statutes:

> Failing to deliver work meeting [the warranty clause] requirements gives rise to a cause of action to seek return of funds already paid.  Ala. Code § 7-2-711 (where seller fails to deliver goods as warranted, buyer may, in addition to other remedies, cancel contract and recover the price that has paid); Ala. Code. § 7-2-714; Massey-Ferguson, Inc. v. Laird, 432 So. 2d 1259 (Ala. 1983) (damages for breach of express warranty include the difference in value between the goods as warranted and value as delivered plus incidental and consequential damages).

Pl.'s Mot. 71.  In Massey-Ferguson, the Supreme Court of Alabama relied on section 7-2-714 of the Alabama code in its calculation of damages for breach of warranty.  Massey-Ferguson, Inc., 432 So. 2d at 1264.

---

[8]      The UAH01 contract did include an inspection provision.  "Inspection.  The University, through its authorized representatives, shall have the right at all reasonable times to inspect or otherwise evaluate the work performed or being performed by the Contractor."  Ex. 18, at DYN 1707 ¶ 2.  Nothing in the text of the inspection clause puts Dynetics at financial risk.

33

Under <u>Lockheed Martin</u>, any determination of risk must be made solely on the "research agreement" between the parties, with no consideration of any external statute not expressly incorporated in that agreement.  <u>Lockheed Martin Corp. v. United States,</u> 210 F.3d 1366 (Fed. Cir. 2000).  In <u>Lockheed Martin</u>, the Federal Circuit considered the question of whether entitlement to the tax credit—which requires the taxpayer to show both that it was put at financial risk by conducting the research and that it retained substantial rights in that research—could be shown by reliance on a statute outside the contract.  <u>Id.</u> at 1370.  The appellate court held that it could not.

> We similarly reject the argument that the determination whether Lockheed Martin retained "substantial rights" to its research can be found by reference to export control laws and top secret classifications; they are also irrelevant because they are outside of the research agreements.  The determination whether Lockheed Martin retained "substantial rights" must be made by reference to the . . . contracts alone.  The regulation's focus on the taxpayer's right under the research agreements makes it clear that the determination whether the taxpayer had the right to use the results of its research without paying for that right must be determined by reference to the research agreements.

<u>Id.</u> at 1375-76.  The companion Treasury regulation governing whether the taxpayer is at financial risk likewise focuses on the taxpayer's right under the research agreements.

> Research does not constitute qualified research to the extent it is funded by any grant, contract, or otherwise by another person (including any governmental entity).  <u>All agreements (not only research contracts) entered into between the taxpayer performing the research and other persons shall be considered in determining the extent to which the research is funded</u>.

Treas. Reg. § 1.41-4A(d)(1) (emphasis added).

Dynetics points to no part of the UAH contract incorporating the Alabama state statutes on which it relies to argue that it faced financial risk.  Under <u>Lockheed Martin</u>, the court is precluded from considering the impact of any statute outside of the UAH01 contract in determining whether Dynetics was at financial risk under the UAH01 contract.  Dynetics made no argument that it was subject to financial risk under the plain text of the warranty provision, and a review of the UAH01 contract fails to show that it was.

G.    Business Risk Arguments

Dynetics argues that it was put at financial risk by the uncertain nature of the work, by the fact that it had to invest in staffing and resources with no commitment from the government to pay those costs, and by the incremental orders placed under the contracts.  Pl.'s Mot. 32-37.

Dynetics argues that for at least four contracts—specifically, AR009, AMS01, BOE12 and NT001—it was "uncertain" about the "nature of the work," as the contracts included "extremely broad statements of work that identified a wide range of work Dynetics would be required to perform."  Id. at 32.  Dynetics argues that "[b]ecause the exact nature of the work could not always be described – or could not be described in a manner to fully disclose all necessary information, Dynetics bore the risk that it would be unable to complete the work within the price proposed, or at all."  Id. at 33.

Next, Dynetics argues that under the contracts, it was "required to incur the costs associated with developing and maintaining the staffing and resources necessary to support the work contemplated by the contract, but the government was not obligated to issue more than a minimal amount of work under the contract."  Id. at 34-35.  Dynetics complains that it bore the risk of its efforts and investments, while the "government had no obligation to continue to use those resources if the research was unsuccessful."  Id.

Dynetics further argues that six of the sample contracts (all but the AF007 contract) "contemplated an uncertain amount of work at the time the contract was funded," as certain contracts were Indefinite Delivery Indefinite Quantity (IDIQ), while others "used options or modifications to order the vast majority of the work contemplated by the contract."  Id.  Dynetics asserts that it faced a financial risk because "[i]f the research Dynetics performed under the initial tasks in these contracts was unsuccessful, the government could have declined to issue any further work under the contract without incurring any additional liability to Dynetics."  Id.

Defendant collectively characterizes these risks as business risks or economic risks, none of which, it asserts, are the type of financial risk contemplated by the Treasury regulation.  Def.'s Resp. 23-25.  In support of its position, defendant points to both the relevant Treasury regulation, and the Federal Circuit's interpretation thereof in Fairchild.

As provided in the Treasury regulation governing qualified research, "[a]mounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research . . . are not treated as funding."  Treas. Reg. § 1.41-4A(d)(1).

As the Federal Circuit has explained,

> [t]he inquiry turns on who bears the research costs upon failure, not on whether the researcher is likely to succeed in performing the project.  When payment is contingent on performance, such as the successful research and development of a new product or process, the researcher [Dynetics] bears the risk of failure.

Fairchild, 71 F.3d at 873.

It is clear that none of plaintiff's arguments suggest a circumstance under which it will not be paid for the results of unsuccessful research.  As this is the only financial risk considered by the Treasury regulation in determining whether expenses are funded, that is the only risk relevant in this motion.  Plaintiff's assertions of any other risk are irrelevant to the court's resolution of this motion.

H.     Termination Clauses

Plaintiff also argues it was at risk from the FAR termination clauses incorporated into each sample contract.  Pl.'s Mot. 37.  "In all cases, the government could terminate the contract for convenience, and the government's liability would be capped to work done under the contract for convenience, and the government's liability would be capped to work done under the contract and certain unwinding costs."  Id. (citing FAR 52.249-1 to 52.249-7).  Dynetics argues it was at risk because if the government terminated the contract for convenience, it "would still be left with the costs and expenses arising from developing the capabilities to do the full amount of work contemplated by the contract."  Id.

Although it argued otherwise, Dynetics was not put at financial risk by the terms of any FAR termination clause.  As an example, FAR 52.249-6 Termination Cost-Reimbursement (Sept. 1996) is incorporated into the AF007 contract.  Ex. 12, at DYN 965.  Under this termination clause, a contractor is entitled to receive all reimbursable costs, together with reasonable costs of settlement of the terminated work.  FAR 52. 249-6(h) (1)-(3).  In addition, the contractor is entitled to receive a portion of the fee payable under the contract, which in the case of a termination for convenience, is "equal to the percentage of completion of work contemplated under the contract."  FAR 52. 249-6(h)(4).

Thus, if the government terminated a contract for convenience, the contractor would receive all reimbursable costs for the work it had performed, together with a

comparable portion of its fee.  While it is true that Dynetics would not have the opportunity to earn its full fee, the loss of an opportunity for profit is not the type of financial risk contemplated in the Treasury regulation.  See Treas. Reg. § 1.41-4A(d)(1).

The court further observes that in Fairchild, the Federal Circuit held that the contractor was put at financial risk under the terms of its contract where the government had in fact terminated Fairchild's contract for convenience, prior to the completion of the contract.  Fairchild, 71 F.3d at 871 ("Fairchild and the Air Force agreed to termination for convenience terms," after Congress cancelled funding for the program.).  Yet, even though the contract in Fairchild included a termination clause and the government actually did terminate the contract, there was no discussion in the Fairchild case about the contractor's financial risk resulting from the termination clause.  Thus, Dynetics' assertions are without meaningful support.

I.      Undefinitized Contracts

The government initially issued three sample contracts as undefinitized contracts, which Dynetics argues put it at risk.  See Pl.'s Mot. 39-40 (AF007); 51 (AR005); 60 (BOE12).  Because Dynetics did not explain how such a contract put it at risk, the court asked Dynetics to provide supplemental briefing on this point.  Order Supp. Br. 2.

Dynetics offered several arguments in response.  First, Dynetics asserts that an undefinitized contract is incomplete, and may lack relevant provisions, "such as price, terms of payment, and inspection and acceptance rights and obligations."  Pl.'s Supp. Br. 3.  Dynetics did not, however, indicate that any of the sample contracts at issue in this motion lacked these relevant provisions.

Second, relying on case law, Dynetics asserts that an undefinitized contract may be unenforceable and thereby leave it at risk of nonpayment.  Id. at 3-4 (citing Trauma Servs. Group Ltd. v. United States, 33 Fed. Cl. 426 (1995)).  But, the agreement in Trauma Services, on which Dynetics based its assertions, was a memorandum of agreement (MOA), not a contract.  Trauma Servs., 33 Fed. Cl. at 430-31.  That a MOA may be unenforceable is irrelevant to whether Dynetics was at risk here under either the AF007 or BOE12 undefinitized contract.

The government responds that Dynetics was not at risk under any of the three sample contracts.  For the AF007 contract, the undefinitized contract included FAR 52.216-07 Allowable Cost and Payment (Dec. 2002), Ex. 12, at DYN 964, which provided that "[t]he Government will make payments to the Contractor when requested as work progresses."  FAR 52.216-7(a)(1).  Contrary to Dynetics' assertion that

37

undefinitized contracts may be incomplete, the AF007 included two pages of FAR clauses.  Ex. 12, at DYN 964-65.

With respect to the BOE12 contract, defendant correctly pointed out that the undefinitized contract provided for payment to Dynetics in the event of contract termination.  Def.'s Reply to Pl.'s Supp. Br. 6-7 (citing Ex. 39, at DYN 41532).

> In the event that a definitive subcontract is not executed because of the inability of the parties hereto to agree upon the provisions of a definitive subcontract, the Buyer, [Boeing], at its sole discretion, may terminate this letter contract in accordance with the provision entitled "Termination for Convenience," and shall pay the Subcontractor [Dynetics] in accordance therewith subject to the limitations contained herein, but with no allowance for profit.

Ex. 39, at DYN 41532 ¶ 7.  Dynetics' only risk here was the possibility that it might not earn a profit.  Again, that is not the risk contemplated by the Treasury regulation.  See Treas. Reg. § 1.41-4A(d)(1).

While the AR005 contract was an undefinitized contract initially, none of the expenses for which Dynetics claims a tax credit were incurred under that undefinitized contract.  Dynetics claims expenses only for wages incurred under the cost-plus-fixed-fee contract line items for engineering services included in the later definitized contract.  See Def.'s Mot. 27; Ex. 27, at DYN 58340.  Those line items were not included in the undefinitized contract.  Ex. 26, at DYN 36189-90.  As Dynetics' expenses were incurred under the definitized contract, it is under that contract that it must show it was at risk.  See Treas. Reg. § 1.41-4A(d)(1) ("Amounts payable under any agreement that are contingent on the success of the research and thus considered to be paid for the product or result of the research . . . are not treated as funding.") (emphasis added).  Dynetics has failed to do so here.

IV.  Discussion – Whether Dynetics Retained Substantial Rights in the Results of the Research

Defendant argues that because Dynetics did not retain substantial rights in the results of the research under the UAH01 and NT001 contracts, it may not take a tax credit for its incurred expenses under either contract.  Def.'s Mot. 40-42.

As provided in the relevant Treasury regulation,

> [i]f a taxpayer performing research for another person retains no substantial rights in research under the agreement providing for the research, the research is treated as fully funded for purposes of section 41(d)(4)(H), and no expenses paid or incurred by the taxpayer in performing the research are qualified research expenses.

Treas. Reg. § 1.41-4A(d)(2);[9] see also Lockheed Martin Corp., 210 F.3d at 1374-75 ("If the taxpayer does not have the right to use or exploit the results of the research, its expenditures are not entitled to the tax credit . . . regardless [of] whether the taxpayer receives some "incidental benefit" such as increased experience.") (emphasis added).

A.    UAH01 Contract

Defendant makes two arguments in support of its position that Dynetics did not retain substantial rights in the results of its research for the University. Def.'s Mot. 41. First, defendant points to the plain language of the contract, under which it argues that Dynetics assigned "all rights in the results of its work" to the University. Id. (citing Ex. 18, at DYN 1709). Defendant also argues that Dynetics' work under the UAH01 contract was a "work for hire," thus Dynetics retained no rights in that work. Id. Defendant first relies on paragraph 24 of the UAH01 contract.

> 24. Patents.[10] (a) [**1st sentence**] All rights, title, and interest in and to inventions or other intellectual property rights conceived or reduced to practice in the course of performance of the work called for by this Contract are hereby vested in the University. [**2d sentence**] The contractor agrees to promptly disclose to the University, in a format acceptable to the University,

---

[9]    Further, "[a] taxpayer does not retain substantial rights in the research if the taxpayer must pay for the right to use the results of the research," Treas. Reg. § 1.41-4A(d)(3). The question of payment for the right to use the results of the research is not an issue in this matter.

[10]    The "Construction Rules" included in the UAH01 contract provide that "[t]he captions and headings in this Contract are for purposes of convenience and reference only, and the words contained therein shall have no substantive effect and shall in no way be held to explain, modify, or amplify the meaning of the sections and provisions of this Contract to which they pertain." Ex. 18, at 1711 ¶ 39(a). Further, "[t]he language in all parts of this contract shall in all cases be simply construed according to its fair meaning and not strictly for or against any party." Ex. 18, at 1711 ¶ 39(d). Neither party commented on the heading "Patents" in paragraph 24. According to the contract's Construction Rules, the court does not consider it when evaluating Dynetics' rights.

> any potentially patentable idea or concept conceived or reduced to practice in the course of performance of the work called for by this Contract.

Ex. 18, at DYN 1709 ¶ 24(a) (annotation added).

Dynetics replies that while it may not have retained substantial rights in all its work for the University, it retained substantial rights in certain work, specifically all "non-patentable technology." Pl.'s Mot. 72 ("Therefore, to the extent the research and development activities undertaken in connection with the UAH contract result in products or knowledge that is not patentable, rights to those products and solutions remain with Dynetics."). Dynetics points to Exhibit C to the UAH01 contract, the "NASA Grantee New Technology Summary Report," through which NASA requires any contractor, like the University, or subcontractor, like Dynetics, to "report new technology" to it. Ex. 18, at DYN 1705. Exhibit C provides that new technology "may be either patentable or non-patentable," and that NASA does not require the disclosure of "non-patentable new technology." Ex. 18, at DYN 1705.

Dynetics asserts that its work under the UAH01 contract—solving equations and developing simulations to describe the deep space environment—is not patentable. Pl.'s Mot. 72 (citing In re Bilski, 545 F.3d 943 (Fed. Cir. 2008) aff'd, Bilski v. Kappos, 561 U.S. 593 (2010)). Patentable inventions include "new and useful process, machine, manufacture, or composition of matter," 35 U.S.C. § 101, none of which, argues Dynetics, would include the products and solutions it developed under the UAH01 contract. Pl.'s Mot. 72. Given that the results of the research under the UAH01 contract were non-patentable, and that NASA did not require the disclosure of non-patentable new technology, Dynetics concludes that such technical products and solutions as it ultimately developed fell outside the second sentence in paragraph 24, and thus it retains substantial rights in that technology. Pl.'s Mot. 72.

Defendant responds that Dynetics overlooks the first sentence of paragraph 24, which "more broadly 'vests in the University' not just patentable 'inventions' but also any 'other intellectual property rights,' such as the copyright in the computer code written by Dynetics." Def.'s Resp. 28. Dynetics offered no reply to this argument. See Pl.'s Reply 19-20.

The Copyright Act defines a "computer program" as "a set of statements or instructions to be used directly or indirectly in a computer in order to bring about a certain result." 17 U.S.C. § 101. "A computer program is a form of literary work, and thus is copyrightable." Greenberg v. National Geographic Soc., 533 F.3d 1244, 1262 n.6

(11th Cir. 2008).[11]   The owner of a copyright enjoys a number of exclusive rights under the Copyright Act.  See, e.g., Cambridge Univ. Press v. Patton, 769 F.3d 1232, 1242 n.5 (11th Cir. 2014) (citing 17 U.S.C. § 501(a)).

Even if Dynetics is correct that the results of the research on the UAH01 contract were non-patentable technology, under the first sentence of paragraph 24, any other intellectual property rights in those results, like copyright protections, would vest in the University.

Dynetics bears the burden of showing it had substantial rights in the results of the research.  See Bubble Room, Inc., 159 F.3d at 561.  In the face of paragraph 24, Dynetics would have to show that the results of the research on the UAH01 contract fell entirely outside the broad category of rights vested in the University—other intellectual property rights conceived or reduced to practice in the course of performance of the work. According to Dynetics' own description of its work on the UAH01 contract—solving equations and developing simulations to describe the deep space environment, Pl.'s Mot. 72—all its work fell within the protection of paragraph 24.

Considering the plain text of the UAH01 contract, and the work Dynetics performed for the University, Dynetics has not carried its burden to show that it retained substantial rights in that work.  The court finds that Dynetics did not retain substantial rights in the results of the research under the UAH01 contract.

As defendant has prevailed on its contractual argument, it is unnecessary to reach defendant's alternate work for hire argument.

B.      NT001 Contract

With regard to the NT001 contract, defendant asks this court to consider Dynetics' work under only one task order, Task Order 169.  See Def.'s Mot. 42 n.15; Def.'s Resp. 29.  According to defendant, the government issued Dynetics approximately 260 task orders under the NT001 contract, however, defendant believes the parties can use this

---

[11]      Copyright issues are not assigned exclusively to the Federal Circuit.  See 28 U.S.C. § 1295 (2012).  "When the questions on appeal involve law and precedent on subjects not exclusively assigned to the Federal Circuit, the court applies the law which would be applied by the regional circuit." Atari Games Corp. v. Nintendo of Am., Inc., 897 F.2d 1572, 1575 (Fed. Cir. 1990).  As this contract was performed in the state of Alabama, which sits within the Eleventh Circuit, the court consults Eleventh Circuit law on copyright issues.

court's resolution of the substantial rights question for Task Order 169 to resolve the same question for the remaining task orders.[12]  Def.'s Mot. 42 n.15.  Accordingly, the court considers only the question of whether Dynetics retained substantial rights to the results of the research performed under Task Order 169 on the NT001 contract, and offers no opinion on whether Dynetics retained substantial rights to the results of the research on any other task order issued under the NT001 contract.

Defendant describes Dynetics' work on the NT001 contract as "highly classified intelligence research on foreign weapons systems."  Def.'s Resp. 29.  In performing its work on the NT001 contract, "Dynetics was required to comply with military security requirements in accordance with DD Form 254, which classified the contract as 'Top Secret.'"  Def.'s Mot. 41; Ex. 34, at DYN 8125 item 1.

The parties disagree on whether the security requirements in DD Form 254 had any effect on Dynetics' right to use the results of the research, including the allocation of intellectual property rights between Dynetics and the government.

1.     Contract Provisions

a.     DD Form 254 Security Requirements for Intelligence Information

The DD Form 254 is the Department of Defense Contract Security Classification Specification, and is Attachment no. 2 to the NT001 contract.  Ex. 34, at DYN 8125; Ex. 34, at 8089 (Section J List of Attachments).  It is a two-page form, and in the case of the NT001 contract, includes four additional, individually-typed "continuation sheets" that include twenty-nine enumerated paragraphs providing further information about security guidance and security requirements.  Id. at DYN 8125-30.  Further, paragraph 6 on continuation sheet page 2, itself incorporates a separate two-page attachment, Attachment no. 1, which includes an additional eleven enumerated paragraphs regarding the security requirements for intelligence information.  See id. at DYN 8127 ¶ 6, 8131-32.

---

[12]     In its reply, Dynetics interpreted defendant's argument as challenging whether Dynetics retained substantial rights in the results of the research only under Task Order 169, but not for work under any other task order.  See Pl.'s Reply 19.  This is an inaccurate characterization of defendant's argument.  Defendant clearly stated that it limited its argument to Task Order 169 only "for the purpose of this motion."  Def.'s Mot. 42 n.15.

As provided in DD Form 254, Dynetics had access to intelligence information that was SCI (Special Compartmented Information[13]) and non-SCI (top secret).  See id. at DYN 8125 items 10(e)(1), (2).  Patrick Keller, a Dynetics employee knowledgeable about the NT001 contract, testified about the distinctions among intelligence information classifications.  See Keller dep. 58:6-59:15, Dec. 12, 2013, Ex. 64.

> [SCI] means that it has to be protected with much greater care than – if secret information is lost, it causes bad damage. . . . Secret, bad; top secret, really, really bad; SCI; exceptional, extreme, grave, bad, serious compromise.  So you have the SCI caveat that means that it is more tightly controlled than just regular top secret information . . . .

Id. at 58:16-59:1.

b.      Task Order 169

Task Order 169 called for Dynetics to provide services in support of a "classified foreign air-defense system" known internally as "Vorlon."  Def.'s Mot. 42.  "The task order employed Dynetics to prepare engineering drawings of the missile and to describe the key physical and operational characteristics of certain sections of the missile in a technical report."  Def's Supp. Br. 7.  According to Mr. Keller, Task Order 169 called for Dynetics to perform an initial characterization of a foreign air defense system, which involved analyzing hardware—a missile nose section and a control section.  Keller Dep. 95:4-15, Dec. 12, 2013, Ex. 64.

Review of the task order itself shows that the Statement of Work described two tasks, which required Dynetics to conduct analyses, prepare engineering drawings in both hardcopy and softcopy (software) formats, identify key characteristics of specified sections of a missile, perform laboratory tests, and document its findings in a report.  Ex. 35, at DYN 9925.  Dynetics' work on Task Order 169 required deliverables of engineering drawings and a technical report.  Id. at DYN 9926.

2.      Discussion

a.      Right to Use or Exploit the Results of the Research

---

[13]      The DD Form 254 refers alternately to <u>Sensitive</u> Compartmented Information, Ex. 34, at DYN 8125 item 10(e)(1), and <u>Special</u> Compartmented Information, Ex. 34, at DYN 8128 ¶ 16.  The terms are used interchangeably.

Defendant argues that the intelligence information—either SCI or top secret—Dynetics used in performing Task Order 169 permeated the results of that research, to the point that the security requirements in the DD Form 254 prevented Dynetics from using those results, just as the same security requirements prevented Dynetics from using the intelligence information itself.  See Def.'s Mot. 41-42; Def.'s Resp. 29 ("Because one cannot segregate the results of Dynetics' work on that task order from the 'Top Secret' or 'SCI' material that Dynetics was retained to characterize, Dynetics can have no right to 'use or exploit the results of the research.'"); Def.'s Supp. Br. 8 ("[The DD Form 254] provisions eliminate any right that Dynetics might otherwise possess to use or exploit the results of its work on Task Order 169, because classified "intelligence information" permeated such work.").

As defendant points out in its supplemental briefing, the DD Form 254 places a number of limits on use of intelligence information.  See id. at 7-8.  A sampling of security restrictions includes the following.

> Intelligence materials generated by your organization may be reproduced without written permission exclusively for this contract.

Ex. 34, at DYN 8131 ¶ 4.

> No authorization is granted to release intelligence material to any activity, employee, or other person not directly engaged in providing services under the contract unless specific written authorization for such release is received from DIA/MSIC.  This prohibition precludes release without authority to another contractor (including a subcontractor), Government Agency, private individual, or organization.

Id. at DYN 8131 ¶ 8 (emphasis added).

> Upon completion of this contract, all materials provided to the contractor will be returned to the Government unless written exception is provided to the contractor.  Materials generated by the contractor may be returned or destroyed as directed.

Id. at DYN 8128 ¶ 10 (emphasis added).

> All materials provided to the contractor under this contract are for the exclusive use of this contract.

Id. at DYN 8128 ¶ 12.

In the face of these significant security restrictions, Dynetics makes several arguments that it nonetheless retained the right to use the results of the research on Task Order 169.  Pl.'s Reply 19.  First, Dynetics points to "skills and advancements" it developed while working on Task Order 169.

> [A]ny capabilities developed in the analysis of the Vorlon system, such as advancements in preparing engineering drawings or improving the method of identifying radio frequency, could be reused in subsequent work performed by Dynetics because those skills and advancements are not necessarily particular to the specific classified weapons system.

Id.

The governing Treasury regulation provides that "[i]ncidental benefits to the taxpayer from performance of the research (for example, increased experience in a field of research) do not constitute substantial rights in the research.").  Treas. Reg. § 1.41-4A(d)(2).  It is unclear how the accumulation of "skills and advancements" would be other than an "incidental benefit," and Dynetics is silent on this point.

Next, Dynetics asserts that it can "use its research results from Task Order 169 in performing work for other intelligence agencies following authorization from MSIC."  Pl.'s Reply 19 (emphasis added) (citing Ex. 34, at DYN 8130 ¶ 22); see also Pl.'s Supp. Br. 11 ("Dynetics retains the rights in the products it develops (including those products with intelligence information) for purposes of performing work pursuant to contracts with MSIC or any other government agency (or private company) provided that MSIC agrees to the transfer of such information.") (citing Ex. 34, at DYN 8132 ¶ 11) (emphasis added).

Dynetics does not address the obvious question of how it could have substantial rights in the results of the research, if it needed the government's "authorization" to use those results.  Nor do the particular DD Form 254 paragraphs cited by Dynetics in its assertion of a right to use—paragraphs 11 and 22—provide it with support.

> The contractor will not reproduce any SCI related material without written permission from the [Contract Monitor]/[Special Security Officer].  When such permission has been granted, the contractor will control and account for such reproduction in the same manner as pertains to originals.

Ex. 34, at 8130 ¶ 22. Dynetics offers no explanation how, if it did receive permission to reproduce "SCI related material," it could "use its research results from Task Order 169 in performing work for other intelligence agencies," as it asserts it can, Pl.'s Reply 19, and still comply with the requirement in paragraph 22 that it "control and account for such reproduction in the same manner as pertains to originals." If Dynetics performed work for another intelligence agency, it would cease to have control over that work, and would be unable to comply with the security requirement in paragraph 22.

DD Form 254 attachment no. 1 paragraph 11 governs intelligence material, SCI and non-SCI, and is included below.

> Upon expiration of the contract, all substantive collateral intelligence materials released to your company will be returned to the issuing agency for disposition. <u>In the event the contract is extended or a new similar contract requiring the released data is initiated</u>, it is the responsibility of the contract monitor to effect an extension or document transfer with the [Defense Intelligence Agency/Missile and Space Intelligence Center] [Special Security Officer].

Ex. 34, at DYN 8132 attach no. 1 ¶ 11 (emphasis added). Paragraph 11 refers to either an extension of the existing contract or the initiation of a new similar contract with MSIC. Nothing in paragraph 11 could be read to suggest that Dynetics had the right to use the results of the research, containing intelligence material, in performing work for "any other government agency (or private company)," as Dynetics asserts it could. <u>See</u> Pl.'s Supp. Br. 11.

In its supplemental briefing, Dynetics asserts that the security requirements in Attachment 1 do not preclude it from using "the models, analyses, software enhancements, or testing components developed under the NT001 contract in future contracts," as the intelligence material it used or generated "in many cases is severable from the models and systems developed under the contract." <u>Id.</u> Dynetics' argument was not specific to Task Order 169, but rather spoke generally about its work under the NT001 contract. <u>Id.</u>

Defendant responds that Dynetics produced no "models, analyses, software enhancements, or testing components" under Task Order 169, and thus its assertion of severability is irrelevant to this motion.[14] <u>See</u> Def.'s Reply to Pl.'s Supp. Br. 13.

---

[14]    Defendant acknowledges that "the degree of integration of Dynetics' work product with the intelligence information it concerned" will vary among the remaining task

Finally, Dynetics argues that in <u>Lockheed Martin</u>, the Federal Circuit rejected the position that security classifications, like those found in DD Form 254, can deprive a contractor of substantial rights in the results of the research.  <u>See</u> Pl.'s Reply to Def.'s Supp. Br. 5 (citing <u>Lockheed Martin</u>, 210 F.3d at 1375).  Dynetics is mistaken in its understanding of the Federal Circuit's holding.

The government argued that Lockheed Martin lacked substantial rights in its research because, <u>inter alia</u>, "top secret security provisions and export control laws . . . restricted sales of products resulting from Lockheed Martin's research."  <u>Lockheed Martin</u>, 210 F.3d at 1373.  The trial court found that Lockheed Martin lacked substantial rights in the results of the research for a number of reasons, including that it "had to seek prior approval from the State Department before entering into licensing agreements or discussing with other customers technical information not in the public domain," and that "particular statutory provisions restricted Lockheed Martin's exports."  <u>Lockheed Martin</u>, 210 F.3d at 1370.

On appeal, the Federal Circuit found that the export control laws and security classifications upon which the trial court based its decision were outside the research agreements, and thus irrelevant to the substantial rights determination.  <u>Lockheed Martin</u>, 210 F.3d at 1375-76.  The Federal Circuit was clear that a determination of whether the contractor retained substantial rights "must be made by reference to the [relevant] contracts alone."  <u>Lockheed Martin</u>, 210 F.3d at 1376; <u>see also</u> Treas. Reg. § 1.41-4A(d)(2) ("If a taxpayer performing research for another person retains no substantial rights in research <u>under the agreement providing for the research</u>, the research is treated as fully funded . . . .") (emphasis added).

As discussed <u>supra</u> Part III.B.1.a, the DD Form 254 is clearly part of the NT001 contract.  As the decision in <u>Lockheed Martin</u> had nothing to do with the security classifications themselves, this decision provides Dynetics with no support.

Dynetics has the burden to show that it has substantial rights in its research.  Although Dynetics has offered a number of arguments in furtherance of its claim that it had the requisite substantial rights to the results of the research, the arguments are unpersuasive.  The security requirements simply leave Dynetics with no right to use results that contained intelligence information, without government authorization.  <u>See, e.g.</u>, Ex. 34, at DYN 8130 ¶ 22); <u>Id.</u> at DYN 8132 ¶ 11).  Even with authorization, Dynetics would not have had the right to freely transfer results with intelligence

---

orders, and that plaintiff's severability argument could be relevant in considering substantial right under other task orders.  Def.'s Reply to Pl.'s Supp. Br. 13.

information.  See e.g., Ex. 34, at 8130 ¶ 22.  Although Dynetics advanced a severability argument, it is highly unlikely that this was feasible for Task Order 169 considering the work required.

       b.       Intellectual Property Rights

       Dynetics also argues that the DD Form 254 is unrelated to the allocation between it and the government of the intellectual property rights in the produced research results. See Pl.'s Mot. 69.  In its supplemental briefing, Dynetics urged that it retained intellectual property rights in its research under FAR 52.227-11 Patent Rights—Retention by the Contractor (June 1997), which was incorporated in the NT001 contract by reference. Pl.'s Reply to Def.'s Supp. Br. 5 n.4 (citing Ex. 34, at DYN 8098).

       Dynetics is correct that the NT001 contract does incorporate FAR 52.227-11. That provision in relevant part provides that "[t]he Contractor may retain the entire right, title, and interest throughout the world to each subject invention subject to the provisions of this clause . . . ."  FAR 52.227-11(b).  An "invention" is defined as "any invention or discovery which is or may be patentable," FAR 52.227-11(a)(1), and a "subject invention" is defined as "any invention of the contractor conceived or first actually reduced to practice in the performance of work under this contract . . . ," FAR 52.227-11(a)(6).

       Dynetics avers that the language of FAR 52.227-11 is "almost identical" to the language in the patent rights clause incorporated in each contract in Lockheed Martin, "which the Federal Circuit found conveyed substantial rights to the contractor."  Pl.'s Reply to Def.'s Supp. Br. 5 n.4 (citing Lockheed Martin, 210 F.3d at 1377-78).

       Again, Dynetics is correct.  The patent rights clause in Lockheed Martin stated that "[t]he Contractor may retain the entire right, title, and interest throughout the world or any country thereof in and to each Subject Invention disclosed [ ], subject to the rights obtained by the Government in paragraph (c) of this clause," Lockheed Martin, 210 F.3d at 1378, and this language is almost identical to FAR 52.227-11, as stated above.  The Federal Circuit characterized this rights clause as giving Lockheed Martin the "the right to make and use patented inventions or to exclude unauthorized third parties from making, using, or selling such inventions."  Id. at 1377.

       That said, while FAR 52.227-11 does provide that Dynetics retains patent rights, it does not vest—as Dynetics asserts—all "intellectual property rights" in Dynetics; rather it provides rights only to "subject inventions."  Dynetics makes no argument that the results of the research under Task Order 169—engineering drawings and a technical

report, Ex. 35, at DYN 9926—are patentable.  And unless the research results for which it claims it has substantial rights are patentable, the rights provided by FAR 52.227-11 are irrelevant to the consideration of substantial rights in those research results.

For all the reasons stated, Dynetics has not carried its burden to show that it retained substantial rights in its work on Task Order 169 under the NT001 contract.  The court finds that Dynetics did not retain substantial rights in the results of the research on Task Order 169 under the NT001 contract.

V.      Conclusion

For all the reasons discussed herein, the court **GRANTS** defendant's motion for partial summary judgment on the funded research question, and **DENIES** plaintiff's cross-motion for partial summary judgment on the funded research question.

The parties are directed to file a joint status report by **Tuesday, June 30, 2015**, informing the court how they would like to proceed in this matter.

IT IS SO ORDERED.

s/ Patricia E. Campbell-Smith
PATRICIA E. CAMPBELL-SMITH
Chief Judge